736 F.2d 571
 15 Fed. R. Evid. Serv. 1613
 UNITED STATES of America, Plaintiff-Appellee,
v.
Gary L. "Scott" DICKEY, Dixie A. Harris, Robert Best, Carl
Ray Smith, Edward M. Beasley, Sidney Lee Bradley, Marvin
Ralph "Rusty" Hall, Stephen Pat Nichols, Alan Friedrich,
Thomas Norton Adams, Defendants-Appellants.
 Nos. 83-1128 to 83-1137.
 United States Court of Appeals,
Tenth Circuit.
 May 29, 1984.
 
 Kenneth P. Snoke, Asst. U.S. Atty., N.D. Okl., Tulsa, Okl. (Frank Keating, U.S. Atty., Tulsa, Okl., on the brief), for plaintiff-appellee.
 Art Fleak, Jr., Tulsa, Okl., for defendants-appellants Dickey and Adams.
 Don Grace, Oklahoma City, Okl., for defendant-appellant Harris.
 James E. Wallace, Grove, Okl., for defendant-appellant Best.
 Alan R. Carlson of Garrison, Brown & Carlson, Bartlesville, Okl. (Michael R. Brown, Bartlesville, Okl., on the brief), for defendant-appellant Smith.
 Richard Esper, El Paso, Tex. (Joseph Abraham, Jr., and Charles Louis Roberts, El Paso, Tex., on the brief), for defendants-appellants Beasley and Bradley.
 Patrick A. Williams of Williams, Donovan & Savage, Tulsa, Okl., for defendant-appellant Hall.
 James E. Frasier of Frasier, Frasier & Gullekson, Tulsa, Okl., for defendant-appellant Nichols.
 Joel Hirschhorn, Miami, Fla., for defendant-appellant Friedrich.
 Before BARRETT, McKAY and LOGAN, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Ten defendants appeal from a jury verdict convicting each of them on one count of conspiracy to possess with intent to distribute, and to distribute marijuana and cocaine in violation of 21 U.S.C. Secs. 841 and 846 (Count I). Defendant Marvin Ralph "Rusty" Hall also appeals from a jury verdict convicting him on one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848 (Count II). The appellants raise several separate and several identical questions on appeal. In our view, the following issues are determinative of these appeals: (1) whether the trial court erred in denying various motions of the appellants by finding that there existed only one, continuing conspiracy, (2) if not, whether there was sufficient evidence presented to connect each appellant to the overall conspiracy, (3) whether there was sufficient evidence presented to sustain a guilty verdict as to appellant Hall on Count II of the indictment, (4) whether the trial court erred in refusing to order separate trials for the appellants, (5) whether comments made by the prosecutor in closing argument amounted to prosecutorial misconduct warranting a new trial for the appellants, (6) whether the trial court erred in the sentencing of appellant Hall (7) whether the trial court erred in sentencing appellants Beasley and Bradley to different terms, and (8) whether the trial court erred in its rulings on the admissibility of certain evidence.
 
 I.
 FACTS
 
 2
 Because a detailed review of the facts would be more voluminous than this opinion requires, we will present a summary of the pertinent facts established in the record.
 
 
 3
 In early 1977, Rodney Bragg, a government witness, met Rusty Hall and Ed Beasley while Bragg was engaged in a private aircraft sales and brokering business. This meeting was connected with Bragg's aircraft business. A second government witness, Doc Clanton, first met Hall and Beasley in the spring of 1977. At the same time, Hall met with Bragg concerning Hall's need for an airplane to haul marijuana from Mexico. Hall subsequently purchased a PBY aircraft (floating boat) for $40,000 from one Al Selcer, for whom Bragg sold airplanes. Because the PBY aircraft was in Costa Rica and the seller was unable to deliver it to Hall in Tulsa, Bragg, who had left the seller's company, Clanton, and another pilot were paid approximately $10,000 by Hall to pick up the aircraft and deliver it to him. Further, Hall paid approximately $12,000 for maintenance work to make the aircraft operational. Upon Hall's direction, Bragg later sold the aircraft and Hall received $100,000 from the sale.
 
 
 4
 In about June, 1977, Beasley and Bragg met in Tulsa, Oklahoma; Beasley gave Bragg a gift of approximately one pound of marijuana from Mexico and the two discussed the quality of Mexican marijuana. At about this time, Bragg, Clanton and Beasley formed a new airplane sales and brokering business called "Paloma Air Oklahoma, Inc." In about August, 1977, Bragg contacted Beasley about the "probability" of Beasley supplying a pound of cocaine to Bragg for a potential buyer in Tulsa. After Beasley flew to Tulsa from New Mexico, the original prospective buyer decided not to purchase the cocaine; therefore, Bragg telephoned Hall, who came to Tulsa and eventually purchased the pound of cocaine from Beasley for $20,000 in cash.
 
 
 5
 In about August, 1978, Bragg met with Beasley, Sidney Bradley, and another person in El Paso, Texas to discuss the importation and distribution of marijuana from Mexico. Part of the marijuana that was discussed was eventually to be delivered to Hall. Approximately one month later, Clanton flew Hall, Robert Best, and Bragg to Las Cruces, New Mexico to meet with Beasley about the possible purchase of marijuana. On this trip, Hall also planned to show his aircraft to a prospective buyer in Clovis, New Mexico. After arriving in Las Cruces, Hall, Best, Bragg, Bradley, Beasley, and alleged coconspirator "Hap" Taylor[1] all went to a storage area adjacent to a residence where they observed approximately forty to sixty pounds of poor quality marijuana. After Best smoked some of the marijuana to "test" it, Hall and Best rejected it and all of the individuals subsequently left the area.
 
 
 6
 In October, 1978, Bragg had a discussion with Beasley and Thomas Adams about the possibility of selling some Colombian marijuana in New Mexico and Colorado. Bragg later performed his assigned task of contacting Hall as a possible Colombian marijuana source. Bragg, Beasley, and Adams subsequently flew to Tulsa and met with Hall at his residence where they were "fronted" (advanced without payment) sixty pounds of Colombian marijuana by Hall. Later that evening, Beasley, Adams, Bragg, and Ruth Bragg (Rod Bragg's wife) agreed that the Braggs would transport the marijuana in the trunk of a vehicle to Albuquerque, New Mexico. After this was accomplished, Adams picked up the marijuana in Albuquerque. An agreement had been made between Clanton, Rod Bragg, Beasley, and Adams to invest $10,000 in the Colombian marijuana venture by paying Hall if the others failed to sell the marijuana within one week. On October 30, 1978, Clanton flew to Amarillo, Texas, to pick up $4,000 from Adams as part of the money owed to Hall; Clanton eventually gave the $4,000 to Hall.
 
 
 7
 On November 17, 1978, after Adams and Beasley failed to sell all of the Colombian marijuana in New Mexico, Clanton flew to Albuquerque to retrieve the unsold portion (twelve to twenty pounds). After Clanton returned it to Tulsa, some of the marijuana was fronted to Scott Dickey by Bragg. In early December, 1978, Taylor telephoned Clanton and identified himself as a friend of Beasley and Bradley. Taylor and Clanton subsequently met and Taylor said that he had a load of marijuana in his pickup truck to deliver in Tulsa, and that Beasley and Bradley were to arrive in Tulsa soon. Clanton then met Beasley and Bradley at Riverside Airport in Tulsa; Beasley told Clanton to contact Hall since the marijuana was for him. Hall told Clanton to have the others meet at his (Hall's) ex-residence and ex-place of business. Hall notified Best of the meeting and, as planned, Beasley, Bradley, Taylor, Clanton, Hall, and Best met at the pre-arranged site.
 
 
 8
 At the meeting, approximately 600 pounds of marijuana was unloaded from Taylor's pickup truck with each bale (sixty to eighty pounds) marked to indicate its quality. Hall directed the others which bales to load into his car and which bales to load into Best's pickup truck. Hall paid Beasley more than $130,000 for the marijuana from cash that he kept in an ammunition box in the trunk of his car. This box was similar to one later found at Hall's residence.
 
 
 9
 In late December, 1978, Carl Smith and Bradley flew into Tulsa in Smith's airplane carrying approximately 600 pounds of marijuana. Beasley had earlier told Clanton of the expected arrival of the Smith airplane. Bragg unloaded one bale of the marijuana (which had been fronted to him by Beasley) and left--he later shared the bale with Dickey. The others were worried about unloading the marijuana from Smith's airplane at Riverside Airport; Smith and Bradley, therefore, flew the airplane to a more secluded airport at Sand Springs, Oklahoma. Clanton and Beasley drove a rental car to the new location, and the four loaded approximately 300 pounds of the marijuana into the rental car. Smith and Bradley then flew to Muskogee, Oklahoma, to deliver the remaining marijuana to another individual. Beasley and Clanton drove the rental car to Hall's ex-business where they met Hall and Best. Hall directed the others to load his car with a certain amount of marijuana and to load the rest into Best's car. Hall paid Beasley approximately $60,000 in cash for the marijuana, again from the ammunition box in the trunk of his car.
 
 
 10
 In early January, 1979, Clanton met with Beasley and Smith in Socorro, New Mexico; they showed Clanton several bales of marijuana which were kept behind a travel trailer belonging to Smith. After Beasley and Smith requested him to do so, Clanton flew three bales back to Tulsa; one bale was for Bragg and two bales for a cousin of Bradley's in Muskogee. On or about January 15, 1979, a meeting called by Bradley was held between him, Clanton, and Bragg at a motel in Tulsa. At the meeting, Bragg paid Bradley for the marijuana he had received from Beasley and Smith.
 
 
 11
 Clanton was aware that Hall was interested in obtaining another cocaine source. Therefore, in February, 1979, Clanton telephoned Hall to solicit his interest in purchasing cocaine supplied by one Joe Hill. After reaching an agreement, Clanton sold Hall eight ounces of cocaine, which came from Hill, for $1,650 per ounce.
 
 
 12
 At Hall's request, Clanton arranged a meeting in March, 1979, with Joe Hill. At the meeting, Hall made a cash offer to Hill in return for Hill's flying to Miami, Florida to pick up cocaine and transport it back to Hall. Clanton received a $6,000 brokerage fee from Hall for his part in this arrangement.[2]
 
 
 13
 From 1979 through early 1980, Rod Bragg, Ruth Bragg, and Dickey occasionally traveled to Hall's house to pay for marijuana and cocaine which they had previously obtained, and to acquire additional quantities of the drugs for resale. Ruth Bragg kept the records for these trips which occurred from two to three times each month. Hall told Ruth Bragg that he was to be paid for the drugs in bills no smaller than twenties, the bills must all be facing one direction, and the money must be in thousand-dollar bundles. In early 1980, the parties determined that the Braggs had paid Hall approximately $500,000 during the previous year.
 
 
 14
 In about August or September, 1979, Adams purchased an airplane for himself and Hall from Clanton, which Adams indicated was to be used to haul marijuana off of a mountain strip at 5,000 feet of altitude. Adams paid for the airplane with $30,000 in cash; Hall later told Clanton that the whole $30,000 was Hall's. Near the end of 1979, Hall directed the Braggs not to come to his house in the future; instead, they were to obtain drugs and make payments at Best's house in Broken Arrow, Oklahoma. The Braggs and Dickey subsequently followed Hall's direction. Further, Hall told Clanton in April, 1980, as he was selling Clanton a pound of cocaine, that he was going to avoid personally distributing cocaine--other people like Best would take over that responsibility.
 
 
 15
 On or about April 24, 1980, Clanton purchased a pound of cocaine from Hall for approximately $30,000 which Hall said was part of a large purchase he had made recently. Stephen Nichols helped Clanton finance the purchase of this cocaine and helped Clanton to resell it later. Dixie Harris also received part of this cocaine from Nichols.
 
 
 16
 At the same time that Clanton purchased the pound of cocaine from Rusty Hall, he met alleged coconspirator Judy Ann Hall (Jo Hall)[3], an ex-wife of Rusty Hall. Jo Hall informed Clanton that she was Rusty Hall's source for cocaine; she asked Clanton to come to Miami, Florida, where she would sell cocaine to him at a lower rate. With Rusty Hall's permission, Clanton subsequently flew to Miami on or about May 10, 1980. At that time, Jo Hall introduced Clanton to Alan Friedrich and on the following day, Friedrich and Jo Hall sold Clanton a kilogram of cocaine for $54,000 which Clanton transported back to Oklahoma. Pursuant to a pre-arranged deal, Harris received most of this cocaine in Oklahoma City from Clanton for resale; the remainder was taken to Tulsa where Nichols and Clanton sold it.
 
 
 17
 At the end of May, 1980, Clanton and Harris went to Miami to purchase another kilogram of cocaine from Friedrich and Jo Hall. Harris, however, remained at the motel and did not meet Friedrich. Clanton paid $56,000 for this cocaine, part of the money coming from a loan by Nichols. After this cocaine was flown back to Oklahoma City, Harris received approximately one-half of it for resale; Nichols and a friend received the other half. On or about August 11, 1980, Clanton and Harris flew to Fort Lauderdale, Florida, and purchased another kilogram of cocaine for $56,000 from a different source. In September, 1980, Nichols and Clanton met Harris at Stroud, Oklahoma, where Harris returned approximately eleven ounces of cocaine along with $11,000 to $12,000 in cash.
 
 
 18
 In December, 1980, Clanton and Nichols met Jo Hall at a shopping center in Tulsa, and purchased two ounces of cocaine from her for $2,400 an ounce. After Clanton apparently protested the high price, Jo Hall explained that it was Rusty Hall's cocaine and that he had set the price. On or about February 11 or 12, 1981, Jo Hall again delivered three ounces of cocaine to Clanton, for $2,400 an ounce, at Tulsa's Riverside Airport. Finally, in late February, 1981, Jo Hall delivered another two or three ounces of cocaine to Clanton, for $2,400 an ounce, at Woodward Park in Tulsa.
 
 
 19
 Clanton went to Best's residence in March or April, 1981, to purchase a quarter ounce of cocaine for $650 in the presence of Nichols. At the time of the transaction, Best was also in possession of approximately one additional kilogram of cocaine.
 
 
 20
 The record shows that during the course of the conspiracy, Clanton talked with all of the charged coconspirators except Dickey on the telephone about drug transactions. Clanton did not deal directly with Dickey; he was aware, however, that Dickey worked with Rod Bragg in distributing drugs. Further, Rod Bragg knew all the appellants except Dixie Harris and Alan Friedrich. Finally, the record revealed that during 1979 Rusty Hall spent large amounts of money, in cash, for personal items including cars, jewelry, real estate, and a swimming pool. Several witnesses for the government testified that many of these items were purchased in another person's name. Evidence was also presented to show that Hall purchased these items with money that he had acquired through drug transactions.
 
 II.
 A. Single v. Multiple Conspiracies
 
 21
 The first question presented is whether the evidence was sufficient to establish the existence of a single conspiracy to possess with intent to distribute, and to distribute, marijuana and cocaine. The appellants argue that the evidence was insufficient to prove one conspiracy; hence, they assert that the evidence revealed the existence of multiple conspiracies. The appellants' primary assertion, therefore, is that there was a prejudicial variation between Count I of the indictment, which charged a single conspiracy, and the government's evidence at trial, which the appellants contend establishes several separate conspiracies.
 
 
 22
 A variance occurs when the evidence presented at trial establishes facts which are different from those alleged in the indictment. United States v. Brewer, 630 F.2d 795, 799 (10th Cir.1980) (quoting Dunn v. United States, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979)). Further, a prejudicial variance may be shown where there exists a " 'transference of guilt to an accused from incriminating evidence presented in connection with the prosecution of another in the same trial for a crime in which the accused did not participate.' " United States v. Brewer, supra at 799 (quoting United States v. Morris, 623 F.2d 145, 149 (10th Cir.1980), cert. denied, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980)).
 
 
 23
 It is essential to emphasize initially that the question whether there existed evidence sufficient to establish a single conspiracy is one of fact for the jury to decide. United States v. Watson, 594 F.2d 1330, 1340 (10th Cir.1979), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). See also United States v. Petersen, 611 F.2d 1313, 1327 (10th Cir.1979), cert. denied, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). When reviewing the jury's decision, we must view all of the evidence, both direct and circumstantial, in the light most favorable to the government, and all reasonable inferences and credibility choices must be made in support of the jury's verdict. United States v. Pilling, 721 F.2d 286, 288-89 (10th Cir.1983); United States v. Massey, 687 F.2d 1348, 1354 (10th Cir.1982); United States v. Petersen, supra at 1317. To make a finding of a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal. United States v. Brewer, supra at 799; United States v. Petersen, supra at 1326-27. To satisfy this "common objective" test ("chain conspiracy"), the essential element of interdependence must be met--each alleged coconspirator must depend on the successful operation of each "link" in the chain to achieve the common goal. United States v. Petersen, supra at 1326-27 (quoting United States v. Elliott, 571 F.2d 880, 901 (5th Cir.1978), cert. denied, 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1978); United States v. Parnell, 581 F.2d 1374, 1382 (10th Cir.1978), cert. denied, 439 U.S. 1076, 96 S.Ct. 852, 59 L.Ed.2d 44 (1979)).
 
 
 24
 We must note, however, that even though we refer to "links" in a chain, " '[m]ost narcotics networks involve loosely knit vertically-integrated combinations.' " United States v. Brewer, supra at 799 (quoting United States v. Panebianco, 543 F.2d 447, 452-53 (2d Cir.1976), cert. denied, 429 U.S. 1103, 97 S.Ct. 1129, 51 L.Ed.2d 553 (1977)). Although many separate transactions were involved, this does not necessarily establish the existence of many separate conspiracies; instead, we must determine "whether such activities constituted essential and integral steps toward the realization of a common, illicit goal." United States v. Brewer, supra at 799. See also United States v. Petersen, supra; United States v. Parnell, supra.
 
 
 25
 Applying the above-mentioned rules to the facts of this case, we agree with the government that the jury properly found the existence of a single conspiracy. There was sufficient evidence to show that the conspiracy was comprised of a common goal between all participants, i.e., to possess and distribute drugs (marijuana and cocaine) for profit. Further, we hold that the key element of interdependence has been established. As we have previously held, "[w]here large quantities of [drugs] are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know." United States v. Watson, supra at 1340 (citing United States v. Heath, 580 F.2d 1011, 1022 (10th Cir.1978), cert. denied, 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979)). The record in this case clearly establishes that the success of the overall scheme of distributing drugs for profit depended upon the successful completion of each of the transactions described above. Even the remote members of the conspiracy were undeniably dependent on the success of each transaction to ensure the continuing prosperity of the overall scheme. The success of each transaction was essential to attain ultimate goal of profitability.
 
 
 26
 In addition to the argument that the separate transactions involved in this case show evidence of separate conspiracies, some of the appellants assert that there is another ground for multiple conspiracies because more than one drug was involved. Although they admit that there can be one conspiracy involving both drugs, the appellants contend that there was no evidence linking the two drugs together in this case. We disagree. In a case such as this where large amounts of drugs are being distributed and the participants are aware that private planes are being used in the operation, we will presume that the participants knew that they were part of a wide-ranging venture. See United States v. Hawkins, 661 F.2d 436, 454 (5th Cir.1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287, 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1355 (1982); United States v. Watson, supra at 1340. The fact that one alleged coconspirator was directly involved with only one type of drug will not reverse a finding of a single conspiracy to distribute drugs in violation of 21 U.S.C. Sec. 846.[4] Cf. United States v. Hawkins, supra at 454; United States v. Murray, 618 F.2d 892, 902-03 (2d Cir.1980). Further, we hold that there exists sufficient evidence "linking" the transactions in each drug to result in one conspiracy.
 
 
 27
 We hold, therefore, that when viewing the record as a whole in the light most favorable to the government, there was sufficient evidence to justify the jury's conclusion that a single conspiracy existed. Thus, no prejudicial variance was present between Count I of the indictment and the proof adduced at trial on the same count.[5]
 
 
 28
 B. Sufficiency of The Evidence: Conspiracy Count
 
 
 29
 Most of the appellants argue on appeal that the evidence at trial was insufficient to connect them individually to a single conspiracy to possess and distribute marijuana and cocaine. In reviewing these contentions, we must use the same standard as that used to review the jury's finding of a single conspiracy--the entire record must be viewed in the light most favorable to the government to determine whether all the evidence and reasonable inferences to be drawn therefrom is sufficient enough to show guilt beyond a reasonable doubt. United States v. Petersen, supra at 1317. In conspiracy cases, in order to sustain a jury's determination of guilt, the record need show only "slight evidence of a particular defendant's connection with a conspiracy that has already been established through independent evidence." Id. (citing United States v. Andrews, 585 F.2d 961 (10th Cir.1978)). To determine the existence of this evidence, we must remember that each participant who may join the conspiracy at any time during its existence need not necessarily know all the details or all the other parties--he need only be aware of the scheme's general scope. See Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); United States v. Johnson, 645 F.2d 865, 868 n. 2 (10th Cir.1981), cert. denied, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1982); United States v. Brewer, supra at 800. We must, however, be mindful that guilt is still individual and personal in conspiracy cases--it is not a matter of mass application. United States v. Watson, supra at 1337 (citing United States v. Butler, 494 F.2d 1246, 1256 (10th Cir.1974)). We will now apply these standards to the individual appellant's contentions.
 
 
 30
 (1) Rusty Hall: Hall primarily contends that the evidence presented at trial established merely a buyer-seller relationship between the appellants (including himself); hence, the evidence was inadequate to tie him to the charged larger conspiracy. We agree that mere proof of the existence of a buyer-seller relationship is not enough to convict one as a coconspirator. See United States v. Watson, supra at 1337. However, this was not such a case. The evidence clearly established Hall as a major participant in the drug distribution scheme. Hall was in control of the operation--he was personally involved in aircraft purchases, and he often determined the locations and times of meetings, together with the price and allocation of the substances. The evidence was more than adequate to connect Rusty Hall to the overall conspiracy.
 
 
 31
 (2) Ed Beasley and Sid Bradley: Beasley and Bradley do not assert a sufficiency of evidence contention on appeal. Even so, a review of the record shows that the evidence was sufficient to connect each of them to the overall conspiracy.
 
 
 32
 (3) Robert Best: Best argues that the evidence merely established his limited involvement in two marijuana deliveries in December, 1978. He contends that the government is attempting to place "inference upon inference" to prove his extensive involvement in the overall scheme. Our review of the record, however, shows that Best was more than a "minor participant" in the conspiracy. The evidence established that Best (1) traveled with Rusty Hall, Rod Bragg, and Clanton to Las Cruces, New Mexico, in September, 1978 to "test" the marijuana for Hall (which was ultimately rejected) (R., Vol. XIII at 93-94; Vol. XVIII at 25-29), (2) met in Tulsa, Oklahoma, with Rusty Hall, Beasley, Bradley, Taylor, and Clanton in early December, 1978 and received part of a 600-pound shipment of marijuana (R., Vol. XV at 142-43; Vol. XIII at 121-22), (3) met with Beasley, Clanton, and Rusty Hall in late December, 1978, and received part of a 300-pound shipment of marijuana (R., Vol. XIII at 125-30), (4) took over, under Hall's direction, marijuana and cocaine deliveries and collections for Hall in the spring of 1980 (Id. at 186), and (5) subsequently made marijuana and cocaine sales to Clanton, Bragg, Nichols, and Dickey (Id. at 164; Vol. XVIII at 50-53, 192-94 and 209; Vol. XIX at 119-21).
 
 
 33
 The evidence was sufficient to connect Best individually to the single conspiracy charged.
 
 
 34
 (4) Alan Friedrich: Friedrich asserts that there was insufficient evidence of his connection with the conspiracy primarily based in New Mexico and Oklahoma; he argues that the evidence, at the most, establishes a separate venture between him and Doc Clanton. He bases this assertion on the fact that Clanton felt compelled to seek Rusty Hall's permission to deal with Jo Hall. Friedrich argues that Clanton did not want to offend Rusty Hall by entering into a separate venture without Hall's permission. Further, Friedrich contends that (1) he was only involved for two days, (2) he met no one other than Clanton and Jo Hall, (3) he never left Miami, (4) Rusty Hall did not receive any money or cocaine as a result of the two transactions Friedrich was allegedly involved in, and (5) Clanton testified that, to his knowledge, Friedrich was not involved in any of Hall's marijuana dealings. Initial Brief of Appellant Friedrich at 44. Thus, Friedrich urges that Clanton and he merely had a buyer-seller relationship.
 
 
 35
 The government responds that the evidence was sufficient to establish Friedrich's guilt beyond a reasonable doubt. The evidence at trial, the government argues, showed that (1) Friedrich was introduced in May, 1980 by Jo Hall as "Rusty Hall's source of cocaine" (R., Vol. XIII at 145-47; Vol. XVI at 75), (2) Friedrich and Jo Hall subsequently sold Clanton two kilograms of cocaine on two occasions (R., Vol. XIII at 145-54), (3) Friedrich's telephone numbers were found in Rusty Hall's records in a search of Hall's residence in April, 1982, (4) the telephone toll records revealed that fifty-one calls were made from Friedrich's residence telephone to Rusty Hall's telephone and six calls were made to Doc Clanton's telephone from April, 1980 through April, 1982, and (5) one telephone call was made from Nichols' residence to Friedrich's business telephone in Miami (See Consolidated Brief of Appellee United States of America at 46; Initial Brief of Appellant Friedrich at 32; R., Vol. XV at 28-30; Plaintiff's Exhibit 40).
 
 
 36
 Although we are unable to find testimony in the record verifying the government's assertion that Jo Hall introduced Friedrich as "Rusty Hall's source of cocaine" and although we agree that mere telephone calls between two parties fail to establish a conspiracy, United States v. Galvan, 693 F.2d 417, 419-20 (5th Cir.1982), we hold that the evidence as a whole, viewed in the government's favor, together with all reasonable inferences, is sufficient to connect Friedrich to the overall conspiracy. Friedrich's presence with Jo Hall at the two transactions with Clanton, together with Jo Hall's assertion that she was Rusty Hall's source of cocaine and that Friedrich was her "connection" (R., Vol. XVI at 75), is enough to presume Friedrich's position as a major cocaine supplier. Because large quantities of cocaine were being distributed, we will presume that Friedrich, as a major supplier, had knowledge of his part in a broad venture. See United States v. Watson, supra at 1340; United States v. Heath, supra at 1022. These two acts by Friedrich (participation in the two Clanton cocaine transactions) are such that his knowledge of the broader conspiracy may be inferred. Hence, these acts are sufficient to draw him into the broad scheme to violate the drug laws. See United States v. Watson, supra at 1337; United States v. Sperling, 506 F.2d 1323, 1342 (2d Cir.1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).
 
 
 37
 (5) Gary "Scott" Dickey: Dickey contends that there is absolutely no evidence of his connection to a conspiracy with Rusty Hall and the other appellants. However, the record in this case shows that Dickey was a partner with Rod and Ruth Bragg in the distribution of marijuana and cocaine which they had obtained from Rusty Hall and Best between late 1978 through middle 1980 (R., Vol. XVIII at 37-40). The record further contains numerous references to Dickey's association with Rod Bragg throughout the time period in question, including the fact that they followed directions from Hall (Id. at 37 and 40-53). We hold that the evidence was sufficient to connect Dickey to the overall conspiracy.
 
 
 38
 (6) Carl Smith: Smith bases his contention of insufficient evidence to convict him on the assertion that his involvement merely in two marijuana transactions may not raise a presumption of his knowledge of a scheme to distribute cocaine. Because Smith was involved in transactions involving large amounts of marijuana (600 pounds at one time) (R., Vol. XIII at 125-27 and 133-36), his knowledge of a broader venture is readily subject to an inference. Further, the several calls from his telephone to Clanton's, Rusty Hall's, the Braggs', Beasley's, and Bradley's telephones make the inference of his connection even more reasonable. Finally, Smith's contention that he may not be connected to the single scheme because of the absence of his actual knowledge of cocaine distribution is without merit. It is fundamental that "a party may join an ongoing conspiracy during its progress and become criminally liable for all acts done in furtherance of the scheme." United States v. Andrews, supra at 964. The evidence, therefore, was legally sufficient to sustain the jury's verdict convicting Smith as a participant in the overall conspiracy.
 
 
 39
 (7) Stephen Pat Nichols: Nichols primarily argues that the government failed to present any evidence that he had knowledge of the ongoing conspiracy (particularly the marijuana aspect) or that he possessed the requisite intent to commit the conspiracy. Nichols contends that the evidence established that he was merely purchasing cocaine for personal use. Initially, we agree that "mere association" with coconspirators is insufficient to prove participation in a conspiracy. See United States v. Lopez, 576 F.2d 840, 844 (10th Cir.1978); United States v. Horton, 646 F.2d 181, 185 (5th Cir.1981), cert. denied, 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981), 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). However, the evidence presented by the government established that Nichols was more than a mere "associate" of Doc Clanton. The evidence showed, among other things, that Nichols (1) was a partner with Clanton in several cocaine transactions with Rusty Hall, Best, Friedrich, and Jo Hall, (2) was a partner with Clanton in the purchase and resale of one pound of cocaine obtained from Rusty Hall in April, 1980, (3) was a partner with Clanton in the May, 1980 purchase and resale of one kilogram of cocaine from Jo Hall and Friedrich in Miami, (4) loaned money to Clanton for another kilogram of cocaine purchased from Friedrich and Jo Hall in Miami in May, 1980 (Nichols received part of this kilogram of cocaine) (R., Vol. XIII at 144-45, 150-55 and 186-87), (5) was a partner in, and present at, the two-ounce cocaine purchase by Clanton from Jo Hall of Rusty Hall's cocaine in December, 1980 (Id. at 160-61), and (6) was connected to numerous telephone calls involving the telephone lines (residential or business) of Harris, Jo Hall, Rusty Hall, and Friedrich.
 
 
 40
 Under the standards we have previously referred to regarding our review of this record, the evidence is clearly sufficient to connect Nichols to the overall conspiracy.
 
 
 41
 (8) Dixie Harris: Harris asserts that the inferences relied upon by the government to establish the single conspiracy are not "reasonable" and, thus, may not be viewed in the light most favorable to the government. See United States v. Watson, supra at 1337 (quoting United States v. Twilligear, 460 F.2d 79, 81-82 (10th Cir.1972)). Harris further contends that the only substantive evidence presented against him does not rise to the level of a presumption of his knowledge of a broad venture. He argues essentially that he was involved only in a buyer-seller relationship with other appellants. After a review of the record, however, we are convinced that sufficient evidence was presented to connect Harris to the overall conspiracy.
 
 
 42
 Harris, a long-time friend and business associate of Nichols, received part of a pound of cocaine purchased by Clanton and Nichols from Rusty Hall in April, 1980 (R., Vol. XV at 263-64 and 276). Harris later became a partner with Clanton in two separate one-kilogram purchases of cocaine from Friedrich and Jo Hall in Miami in May, 1980 (R., Vol. XIII at 149-54). Subsequently, in September, 1980, Harris met with Nichols and Clanton at Stroud, Oklahoma, to return part of the money for "fronted" cocaine and to return some cocaine that he failed to sell (Id. at 150-60). This evidence, along with evidence of telephone calls and numerous cashier's checks (which he had received from Nichols), was sufficient to connect Harris to the single conspiracy charged.
 
 
 43
 (9) Thomas Adams: Adams asserts generally that there is no evidence of a conspiracy between him and the other appellants. The evidence presented by the government, however, established that Adams (1) was a partner with Beasley and Rod Bragg in the purchase of sixty pounds of Colombian marijuana from Rusty Hall in October, 1978 (R., Vol. XVIII at 32-36), (2) met with Clanton and Beasley in Albuquerque in November, 1978, to discuss money problems they were having with sales of the Colombian marijuana (R., Vol. XIII at 114-17), (3) purchased, with the financial support of Rusty Hall, a turbo-charged airplane from Clanton in about August or September, 1979, which was to be used to haul marijuana from high-altitude fields (R., Vol. XVI at 77-78; Vol. XVIII at 80-83), and (4) was linked to several telephone calls with the telephone lines of Rusty Hall, Clanton, Rod and Ruth Bragg, and Beasley.
 
 
 44
 Taken as a whole, this evidence was sufficient to connect Adams to the overall conspiracy charged.
 
 
 45
 C. Sufficiency of the Evidence: Continuing Criminal Enterprise Count
 
 
 46
 Rusty Hall contends that his conviction under section 848 should not stand because the government failed to prove (1) that he obtained substantial income or resources from his operation of a continuing criminal enterprise, and (2) that he occupied a position of organizer, supervisor or manager of a continuing criminal enterprise. In his brief, Hall quotes at length from various portions of the record comprised of testimony by Clanton and the Braggs to support his assertion that there was no evidence of the requisite dominant position he must be shown to have held over five or more people. See Brief of Appellant Hall at 14-20. Hall contends that, at the most, the evidence showed his control only over Robert Best. Id. at 18.
 
 
 47
 As previously expressed, when reviewing a contention of insufficient evidence to support a conviction, we must view all of the evidence in the light most favorable to the prosecution to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The essential elements of section 848 include the following: (1) a continuing series of violations of the Controlled Substances Act of 1970, 21 U.S.C. Secs. 801 et seq., (2) the violations were undertaken in concert with five or more other persons with respect to whom the accused acted as organizer, supervisor or manager, and (3) from which the accused obtained substantial income or resources. 21 U.S.C. Sec. 848(b)[6]; United States v. Phillips, 664 F.2d 971, 1012-13 (5th Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
 
 
 48
 Hall does not dispute the sufficiency of the government's evidence regarding the requirement of a "continuing series of violations." Thus, we must review the record to determine whether the government met its burden of proving the latter two elements. To establish these elements, the government must show first that the accused organized, supervised, or managed at least five other persons. United States v. Phillips, supra at 1013; United States v. Mannino, 635 F.2d 110, 116 (2d Cir.1980). It is noteworthy that this requirement is presented in the disjunctive. United States v. Mannino, supra at 116. Further, the separate relationships need not have existed at the same time, the five persons involved need not have acted in concert at the same time, and the same type of relationship need not exist between the supervisor and each of the other persons involved. United States v. Phillips, supra at 1013. Finally, it is not necessary for the government to establish that the supervisor had personal contact with each of the five persons involved. United States v. Bolts, 558 F.2d 316, 320 (5th Cir.1977), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977), 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978).
 
 
 49
 The language of the court in Mannino is instructive in the instant case:
 
 
 50
 The operative concepts used in section 848--"organize," "supervise," and "manage"--are not technical, and we see no reason to give them other than their everyday meanings. It is true that cases involving well-defined chains of command under the control of a "King Pin" offer the clearest examples of organization, supervision, or management, but the necessary showing can plainly be made in the case of a less structured enterprise.
 
 
 51
 635 F.2d at 117 (citations omitted).
 
 
 52
 The Mannino court went on to affirm the conviction under section 848 of the defendant who was essentially a "middleman" with a large network of purchasers and sources for methaqualone tablets (Quaaludes). Id.
 
 
 53
 Applying these standards to the record before us, we hold there was sufficient evidence establishing Hall's individual relations of control with at least five persons. Hall organized or directed Doc Clanton, Bob Best, Rod and Ruth Bragg, Scott Dickey, Jo Hall, and Joe Hill each on at least one occasion. Hall set up the meeting places for two of the large marijuana transactions in December, 1978, and he directed Clanton and Bob Best as to where to load the marijuana (in either Hall's or Best's car) for future sale (R., Vol. XIII at 120-24 and 129-31). In early 1980, Hall also directed Clanton, the Braggs, and Dickey to refrain in the future from obtaining cocaine and marijuana from him at his house; they were to acquire the "fronted" drugs from Bob Best at his home in Broken Arrow, Oklahoma (Id. at 186; Vol. XVIII at 49-53, 67, 71-72 and 209). Best was present at the meeting in which the Braggs received this instruction from Hall (R., Vol. XVIII at 49 and 71-72). At one time, after the change in distribution places, Hall indicated to Rod Bragg the control that he (Hall) still possessed over Best's distribution of the drugs (Id. at 65-67).
 
 
 54
 The record established further that Hall directed the Braggs about the manner of payment for the drugs he was fronting to them and Dickey (R., Vol. XIX at 115-16). Hall also controlled Rod Bragg and Clanton in the sale of Hall's PBY airplane (R., Vol. XVIII at 12-18; Vol. XIII at 83 and 88). Clanton testified that before he dealt with Jo Hall and Friedrich for the purchase of cocaine in Miami, Clanton wanted to obtain Rusty Hall's permission to prevent upsetting Hall (R., Vol. XIII at 147; Vol. XV at 308; Vol. XVI at 75). On one occasion, Hall directed Jo Hall regarding the price she must obtain from Clanton for an ounce of cocaine she sold him in December, 1980 (R., Vol. XIII at 161; Vol. XVI at 62-63). Finally, the evidence established that in the spring of 1979 Hall organized and managed pilot Joe Hill in the pick up and transportation of cocaine from Miami to Hall in Oklahoma (R., Vol. XIII at 141-43; Vol. XVI at 75-77).
 
 
 55
 The government must next prove that Hall obtained "substantial income or resources" from his involvement in the "continuing series of violations." Hall's contention that the government failed to establish this essential element is totally without merit. The government need not prove a definite amount of net profit--it is sufficient to show substantial gross receipts, gross income or gross expenditures for resources. See United States v. Jeffers, 532 F.2d 1101, 1117 (7th Cir.1976), aff'd, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). Further, a variety of factors may be considered by a trier of fact to make this determination. Cf. United States v. Sisca, 503 F.2d 1337, 1346 (2d Cir.1974), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).
 
 
 56
 The government's evidence on this element consisted of numerous witnesses and documentary evidence which established that, particularly during 1979, Hall spent large sums of money, in cash, for various personal items including jewelry, automobiles, real estate, and a swimming pool (R., Vol. XIX at 226-32 and 237-44; Vol. XX at 8-112; Plaintiff's Exhibits 61-63, 67, 75-77 and 83-113). Several of these witnesses testified that many of the items were purchased in a name other than Hall's and that they were paid for in cash (R., Vol. XIX at 226-32 and 237-44; Vol. XX at 8-112). There was also testimony that Hall had made a statement that he was making $30,000 a month from drug transactions (R., Vol. XVI at 143-44). In fact, Rod and Ruth Bragg both testified that they and Dickey paid Hall in excess of $500,000 in 1979--a year in which Hall declared income for tax purposes of less than $5,000 (R., Vol. XIX at 103 and 115; Vol. XVIII at 57-58; Plaintiff's Exhibit 85).
 
 
 57
 We hold that this evidence was sufficient to establish the fact that Rusty Hall derived "substantial income or resources" from his involvement in the continuing criminal enterprise. Thus, the evidence presented by the government was sufficient to convict Hall under 21 U.S.C. Sec. 848.[7]D. Motions for Severance
 
 
 58
 Each of the appellants asserts that the trial court erred by failing to grant their motions for relief from misjoinder and prejudicial joinder. There are two situations that the appellants contend resulted in either actual or threatened deprivation of their right to a fair trial: joinder of all appellants in the conspiracy count, and joinder of the conspiracy count with the continuing criminal enterprise count.
 
 
 59
 Rule 8(b) of the Federal Rules of Criminal Procedure provides:
 
 
 60
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 
 
 61
 We have held that in conspiracy cases, the proof of one conspiracy is enough to meet the requirements for joinder of defendants under Rule 8(b). United States v. Jorgenson, 451 F.2d 516, 522 (10th Cir.1971), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972). However, each defendant joined must be found to have been connected to the single conspiracy; if so, the acts committed by one defendant in furtherance of the conspiracy are attributable to the others. United States v. Petersen, supra at 1332; United States v. Jorgenson, supra.
 
 
 62
 Because we have previously held that the evidence established one conspiracy and that each appellant was sufficiently connected to the conspiracy, we now hold that the trial court properly joined all appellants in the conspiracy count under Rule 8(b). However, this does not end the matter. Each appellant contends further that he was prejudiced by the joinder under the conspiracy count; hence, each appellant seeks reversal of the trial court's denial of his motion to sever under Rule 14 of the Federal Rules of Criminal Procedure. The appellants, other than Hall, set forth a variety of reasons for the prejudice they suffered--particularly, the "spillover effect" of evidence concerning the other transactions with which they were not directly involved, and the fact that each was a "minor participant" in the overall conspiracy. Thus, each appellant argues essentially that the vast majority of evidence presented to the jury did not refer to him, causing inability of the jury to individually determine the merits of the charge against each appellant.
 
 Rule 14 provides in pertinent part:
 
 63
 If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together, the court may order ... separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 64
 Severance under Rule 14 is discretionary with the trial court; thus, the defendant bears a heavy burden of showing real prejudice to him because of joinder. United States v. Petersen, supra at 1331; United States v. Parnell, supra at 1383. We will not disturb the trial court's decision to deny severance absent an abuse of discretion. United States v. Petersen, supra at 1331. To conclude that there was an abuse of discretion by the trial court, we must hold that the joinder caused either actual or threatened deprivation of one's right to a fair trial. Id.; United States v. Butler, supra at 1256. Further, it is obviously not enough to show merely that " 'separate trials might have offered a better chance for acquittal of one or more of the accused.' " United States v. Petersen, supra at 1331 (quoting United States v. Knowles, 572 F.2d 267, 270 (10th Cir.1978)).
 
 
 65
 We hold that the trial court did not abuse its discretion. As stated above, we have held that one conspiracy existed and, therefore, the acts of one appellant could be attributed to the other appellants. Because we have also held that the evidence was sufficient to connect each appellant to the single conspiracy, the "spillover effect" arguments are without merit. See United States v. Carter, 613 F.2d 256, 260 (10th Cir.1979), cert. denied, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980); United States v. Hawkins, supra at 453. We must note here that when a trial court considers a motion for severance, it "must weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." United States v. Petersen, supra at 1331. Although we agree that the interests of judicial economy should not stand in the way of an individual's right to a fair trial, we believe that the trial court thoroughly considered each appellant's motion in finding no real prejudice to his case. Further, the jury was carefully instructed to individually determine the guilt or innocence of each appellant (R., Vol. XXVI at 10). We hold that the trial court properly found no real prejudice in any of the appellants' cases requiring a separate trial on the conspiracy count.
 
 
 66
 One appellant, Dixie Harris, alleges further that he suffered substantial prejudice by the trial court's joinder of defendants because of his inability to call witnesses, a violation of his sixth amendment right to confrontation, and because of his own silence, a violation of the fifth amendment's self-incrimination clause. Harris contends that, because of the joinder, he was unable to call Rusty Hall, Jo Hall, and Alan Friedrich as witnesses to testify as to Harris's non-involvement. He asserts that his only defense, as a "slightly-connected" participant, was cut off at the outset by the government's joinder. Further, Harris argues that his silence at trial, combined with the testimony of a few codefendants, created an impression of his guilt before the jury. Hence, he urges that he was prejudiced to an extent requiring his severance from the other appellants.
 
 
 67
 First, when the accused's asserted reason for severance is the need for the testimony of a codefendant, he "must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving defendant." United States v. Vigil, 561 F.2d 1316, 1317 (9th Cir.1977). These steps must be met by the moving defendant so as to avoid a finding of prejudice based upon mere speculation. See Smith v. United States, 385 F.2d 34, 38 (5th Cir.1967). In Vigil, counsel for the moving defendant filed an affidavit with his motion to sever swearing (1) that he intended to call the codefendant at trial, and (2) that he was informed by the codefendant's counsel that the testimony given would be favorable to the movant. 561 F.2d at 1317. Further, at the hearing on the motion to sever, counsel for the movant related his understanding that the codefendant would be willing to testify at a separate trial, but not at a joint trial. Id. Because counsel for the movant made the requisite showings and because the importance of the codefendant's testimony to the movant's case was obvious, the appellate court reversed the trial court's denial of the motion for severance. Id. at 1318.
 
 
 68
 In the instant case, Harris's counsel did not meet, nor did he attempt to meet, the prerequisites for severing a defendant from a joint trial on the above-stated grounds. Hence, there was no real prejudice shown by Harris which allegedly violated his sixth amendment right to confrontation.
 
 
 69
 Second, Harris's argument that he was deprived of his fifth amendment right against self incrimination is without merit. We will not find prejudice based on mere conjecture. Further, if we were to adopt Harris's argument, joinder would never be permissible when at least two codefendants chose opposite routes in their constitutional right not to testify.
 
 
 70
 The appellants next argue that the trial court improperly joined the conspiracy count with the continuing-criminal-enterprise count. Specifically, Rusty Hall contends that the government should have been required to prosecute him under either count, but not both. He asserts that he was prejudiced because (1) he could apparently have been embarrassed or confounded in presenting separate defenses, (2) the jury might have inferred a criminal disposition for one charge from evidence supporting the other, and (3) the jury might have cumulated the evidence of the two crimes charged to find guilt under one of the crimes where there was insufficient evidence on that charge. See Drew v. United States, 331 F.2d 85, 88 (D.C.Cir.1964). The other appellants contend that there is no "sufficient similarity" between the two charged offenses and, therefore, the trial court improperly joined the two under Rule 8(a) of the Federal Rules of Criminal Procedure. Alternatively, the other appellants argue that they are entitled to severance under Rule 14 because they were prejudiced for various reasons--particularly, the "spillover effect" of the extensive evidence presented exclusively to establish the criminal-enterprise charge and the effect this evidence had on certain appellants because of their limited involvement in the overall conspiracy. Again, these appellants are arguing essentially that the great amount of evidence presented regarding Count II resulted in the jury's inability to individualize the charges and the evidence.
 
 Rule 8(a) provides in pertinent part:
 
 71
 Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
 
 
 72
 We have held that the joinder of offenses is proper under Rule 8(a) if they are of the same character, United States v. Eagleston, 417 F.2d 11, 14 (10th Cir.1969), or if they grew out of a common scheme or plan. Roth v. United States, 339 F.2d 863, 865 (10th Cir.1964). It is clear that such joinder is also proper when the offenses charged are based on connected acts or transactions. Further, notwithstanding a trial court's determination under Rule 8(a), prejudicial joinder may be found under Rule 14 and it must be found if an individual's right to a fair trial is either threatened or actually deprived. See United States v. Butler, supra at 1256.
 
 
 73
 We hold that the trial court properly denied the appellants' motions for severance of Counts I and II; the arguments presented by Hall and the other appellants do not require reversal of the trial court's decision. First, it is clear that Rule 8(a) authorizes joinder of these two offenses. Because section 846 is a lesser included offense of section 848, Jeffers v. United States, 432 U.S. 137, 150, 97 S.Ct. 2207, 2215, 53 L.Ed.2d 168 (1977), the same predicate evidence necessary to establish a conspiracy is admissible for the purpose of showing a continuing criminal enterprise. In Jeffers, the Supreme Court noted in dictum that a defendant may be tried for conspiracy and for continuing criminal enterprise in one trial without undue prejudice to his right to a fair trial. Id. at 153, 97 S.Ct. at 2217. Second, we find no prejudice to any appellant, especially Hall, as a result of joinder of these two offenses; hence, severance was not required under Rule 14. There was no "spillover" of prejudicial evidence onto any appellant--the evidence of each appellant's connection to the conspiracy was sufficient to convict him of that charge. Further, the record shows that the trial court carefully instructed the jury that the financial evidence was to be considered only against Rusty Hall (R., Vol. XIX at 227; Vol. XX at 7; Vol. XXI at 50-51). Therefore, the trial court did not abuse its discretion in denying the appellants' various motions for severance of Counts I and II of the indictment.
 
 
 74
 E. Prosecutorial Misconduct in Closing Argument
 
 
 75
 Friedrich, Nichols, Best, and Smith contend that certain statements made by the prosecuting attorney in closing argument were so improper and prejudicial as to deprive them of a fair trial. Best and Smith assert that although no single isolated comment by the prosecutor may be enough, the cumulative effect of all the suspect remarks require that they be granted a new trial. Friedrich argues that there were three types of improper comments made by the prosecutor: (1) inflammatory and prejudicial comments, (2) improper expression of personal opinion and argument of facts not in evidence, and (3) improper solicitation of the personal sympathy of the jury. Initial Brief of Appellant Friedrich at 10-20.
 
 
 76
 The first type of allegedly improper comments included three separate statements:
 
 
 77
 (1) In the prosecutor's initial closing, he stated:
 
 
 78
 Mr. Alan Friedrich from Florida. How many times have we heard Florida in the evidence in this case? People coming and going from Florida. They told us all in school Florida was discovered by an old Spaniard named Ponce DeLeon, if you think back with me, an old gentlemen who was looking for the Fountain of Youth, which he never found. If he were to land down there today in Miami with his Spanish troops he would find a fountain. He would find a fountain of cocaine that is just bubbling and bubbling and bubbling and Alan Friedrich is dipping out of it and spreading it and distributing it and giving it away to Doc Clanton at the airport, at the motel--
 
 
 79
 MR. HIRSCHHORN: Objection.
 
 
 80
 MR. BAKER: --and selling it to Doc Clanton.
 
 
 81
 MR. HIRSCHHORN: Objection.
 
 
 82
 THE COURT: Just one moment.
 
 
 83
 MR. HIRSCHHORN: --as to the portion about Miami being the fountain of cocaine.
 
 
 84
 THE COURT: Be sustained as to that part.
 
 
 85
 R., Vol. XXV at 66-67 (emphasis added).
 
 
 86
 (2) Also within his initial closing, the prosecutor argued:
 
 
 87
 [I]t has been a long time before these defendants have been brought in here to answer to a court and a jury for what they have been doing; day after day and week after week, year after year; dealing in drugs, drugs that are destructive, drugs that are dangerous, drugs that the law says you shall not possess with intent to distribute, and you shall not distribute. They are finally, finally going to be judged by you ladies and gentlemen for what they did.
 
 
 88
 Id. at 75-76 (emphasis added).
 
 
 89
 (3) Finally, in rebuttal to the defense counsels' closing arguments, the prosecutor stated:
 
 
 90
 We have heard a great deal about old stories and personal experiences and reminiscences these defense attorneys have had over the years. Few old quotations and old odds and ends have occurred to me. One that only occurs to me in the courtroom is a saying I read--I can't even tell you how long ago. It says the Devil makes his Christmas pies from lawyers tongues and clerk's fingers. From defense attorneys here or defense attorneys a block south of here in the state courthouse, you hear the same. Whether it is the State of Oklahoma against a defendant or the United States of America against a defendant. I have yet to hear a defense attorney stand here and say my client is guilty. They have a great deal of common. They behave a great deal alike in their arguments and some of the rules are these. If the law is against you argue the facts. Now, if the facts are against you you argue the law. But if they are both against you try the prosecution. Let's try somebody else. Let's talk about Mr. Baker. They have mentioned my name in this case, ladies and gentlemen, more than they mentioned most of the defendants. I am not one of the named defendants but in a sense I have been put on trial. I have been accused of leading a vendetta on behalf of my client the United States Government, against people who are totally innocent, good citizens. And if you believe that is true don't even sit down in that jury room, just acquit them all and come right back in here. If you believe for a minute that as a representative of the Department of Justice of the United States Kenneth P. Snoke and Ben F. Baker are so desperate to convict anybody that we manufactured a case then don't hesitate for a minute to turn them loose. On the other hand, after the consideration I know that you are going to give them, if you find that they are guilty beyond a reasonable doubt don't hesitate to find that either. Defense attorneys even share the same stories. Probably the first time you have heard them, isn't the first time I have heard them. It has been at least two months though since I heard the bird-in-the-hand story, that one is heard throughout the land. And it has been over a year I believe since I heard the cup-on-the-table story. That is always a good one....
 
 
 91
 Id. at 243-45.
 
 
 92
 The second type of allegedly improper comments included two separate statements, both of which were made during rebuttal:
 
 
 93
 Here is some more of the fairness they talk about. Where is Fred Means? Where is Fred Means? Of course, subpoenas work both ways. They could have subpoenaed Fred Means. In fact they did subpoena him. They didn't call him. Another old saying is that a man who picks a cat up by the tail gets an experience he can get in no other way, and I think if they had put Fred Means up here for you they would have picked up a cat by the tail.
 
 
 94
 MR. HIRSCHHORN: Objection.
 
 
 95
 THE COURT: Sustained. You will disregard the last statement.
 
 
 96
 MR. BAKER: He was subject to defense subpoena, ladies and gentlemen. They didn't bring him to you. They tell you that I talked to Doc Clanton fifty times, one of these defense attorneys. That involved me. That did not happen. They tell you that one of these witnesses was paid $7,000. There is no evidence of that and I can tell you that did not happen.
 
 
 97
 MR. HIRSCHHORN: Your Honor, I object, counsel--
 
 
 98
 THE COURT: Sustained.
 
 
 99
 MR. HIRSCHHORN: I ask that the jury be admonished.
 
 
 100
 THE COURT: You are admonished not to consider the last phrase of the statement.
 
 
 101
 MR. BAKER: There is no evidence of that in this record, ladies and gentlemen.
 
 
 102
 Id. at 255 (emphasis added).
 
 
 103
 The third type of allegedly improper comments included three separate statements, each made during rebuttal:
 
 
 104
 (1) First, regarding his promises of leniency to Clanton and Bragg, the prosecutor stated:
 
 
 105
 I told Doc Clanton and I told the Braggs I would not personally seek a criminal prosecution against them in this district for what they testified to in the case and for the information they gave to law enforcement, and I fully intend to keep that promise. It is not the first time such a promise was made and it won't be the last. Now, ladies and gentlemen, if you think--if you don't agree with that, and you certainly have a right not to agree with it, please take it up with me later or the United States Attorney later and tell us about it and tell us you think that is a bad policy, but don't let that interfere with your verdicts in this case.
 
 
 106
 THE COURT: Just a moment.
 
 
 107
 MR. WILLIAMS: I object to counsel soliciting personal contact with this jury. It is highly improper and prejudicial.
 
 
 108
 THE COURT: Yes.
 
 
 109
 Id. at 254 (emphasis added).
 
 
 110
 (2) Second, in referring to a dispute over the weight of a certain article of contraband, the prosecutor stated: "Tried to produce the picture for you and that was subject to objection." Id. at 257.
 
 
 111
 (3) Third, the prosecutor concluded his rebuttal by asserting:
 
 
 112
 How many times have you said why doesn't somebody do something about these things? Now you can do something about it. You are the people that can do something about it in this case. I ask you not to be the one juror that they need. The Court will tell you that your verdict must be unanimous, there must be twelve of you for conviction. They just need one of you to prevent that conviction, and they sought for that one juror throughout the trial of this case. Don't be that one juror that they need.
 
 
 113
 MR. WILLIAMS: Your Honor--
 
 
 114
 THE COURT: Sustained.
 
 
 115
 Id. at 257-58 (emphasis added).
 
 
 116
 The government argues that there was sufficient evidence in the record together with common knowledge to support the "fountain of cocaine" comment. In any event, the government urges that the remark did not raise to a level of prejudice requiring a new trial for Friedrich. Further, the government asserts that, regarding the "dangerous drugs" comment, (1) there was no "plain error" because of the remark (no defense counsel had objected) and (2) there was abundant evidence in the record showing that both marijuana and cocaine were dangerous and destructive. Finally, the government argues that the comments made in rebuttal were merely a response in kind to comments made by defense counsel during their closing arguments. The government contends that, in their closing arguments, the attorneys for the defendants:
 
 
 117
 (1) Improperly attempt to create the inference that the government had hidden, or prevented the defense from calling Special Agent Fred Means as a witness [R.T., Vol. XXV, 137, 226]. This, the prosecutor properly answered by pointing out that Fred Means could have been called by the defendants and possibly had they done so, "they would have picked up a cat by the tail." The jury was properly admonished to disregard the last statement by the prosecutor, since Fred Means was called by neither side, although he had been subpoenaed and released by co-counsel, Mr. Brown [R.T., Vol. XXV, 255; 261]. This retort was completely innocuous in response to defense counsel's obvious attempt to divert attention to Mr. Means, and raise an improper inference of governmental misconduct.
 
 
 118
 (2) Improperly state their personal belief in the truth of the testimony of their clients as witnesses and in the innocence of their clients--conduct which, if done by the prosecutor, would have probably resulted in an instant reversal. See: Mr. Esper's argument at Vol. XXV, 106; Mr. Carlson's arguments at Vol. XXV, 135; Mr. Hughes' final argument at Vol. XXV, 212; and Mr. Fleak's at Vol. XXV, 137 and 144].
 
 
 119
 (3) Improperly imply that a government witness was paid $30 a day since February (it then being October), a sum of approximately $7,000 [R.T., Vol. XXV, 154], to which the prosecutor properly responded [R.T., Vol. XXV, 255].
 
 
 120
 (4) Continually imply wrongdoing on the part of the agents and the prosecutors:
 
 
 121
 (a) "Now the prosecutor may get up here and he is going to whoop and holler ... (Mr. Esper)"
 
 
 122
 [R.T., Vol. XXV, 109].
 
 
 123
 (b) Telling the jury that if they convicted co-defendants BEASLEY and BRADLEY, the jurors would be giving up some of the juror's freedom (Mr. Esper) [Id., 119].
 
 
 124
 (c) Impugning the fairness and objectiveness of the government's agents in conducting the investigation (Mr. Hughes) [Id., 202].
 
 
 125
 (d) "And I will ask you to consider as we go through the Count II, the continuing criminal enterprise. My God, the very words just spew out invective and prejudice ..." (Mr. Williams) [Id., 216].
 
 
 126
 (e) Improperly implying that Special Agent James Frazer of the IRS had been "taken off the case," and replaced by Special Agent John Gillette, for misconduct (to which the government's objection was sustained) (Mr. Williams) [Id., 221-222].
 
 
 127
 (f) Implying that Special Agent Cindy Cunningham and "they," are trying to convict innocent people (Mr. Williams) [Id., 229].
 
 
 128
 (g) "I want to tell you something. This Count II is nothing more than accumulation of trash gathered by the government and the IRS to try and make a case against my client in a way they couldn't otherwise, ..." (Mr. Williams) [Id., 233].
 
 
 129
 (h) "I have been to two goat ropings and spent a night in Wynona, Oklahoma, and I have never seen a sleazy weasel on the witness stand like Doc Clanton" (Mr. Williams) [R.T., Vol. XXV, 235].
 
 
 130
 (i) Improperly implying that the government witnesses got together with the government agents and they "fabricated testimony to fit documents and fabricated documents to fit testimony" (Mr. Williams) [Id., 227].
 
 
 131
 (j) "The carrot on the stick. They wiggle it again. It comes up report time, somewhere down the line they decide they ain't [sic] got enough for the Count II. We don't have the five, we have got to have five. Now, we can rely on a dead person maybe, we can rely on a person that is long gone maybe, and we can rely on Ruth and Rod [Bragg] because they are going to say whatever we need. So they throw in Mr. Dickey." (Mr. Hughes) [Id., 208].
 
 
 132
 (k) "..., but I think Mr. Williams hit on that very early in his opening statement when he said it looks like the government is out to get Hall and invite a crowd because they need at least five more people along with this." (Mr. Fleak) [Id., 144].
 
 
 133
 (l) "I heard an old lawyer one time that I greatly admire, one of the great Texas trial lawyers stand up in a seminar and say he too as a defense attorney is a law enforcement officer because he enforces the law against the law enforcer." (Mr. Williams) [Id., 214-215].
 
 
 134
 (m) "..., but James Clanton is that kind of liar. The truth is still in the BBC network, Bragg, Bragg, and Clanton, the truth is still in them because they have got [sic] to tell it. You have been visited with more lies than I have heard in my entire twenty-six years on the carpets and boards and tiles of the various courtrooms that I have had the privilege to appear." (Mr. Williams) [Id., 218].
 
 
 135
 Consolidated Brief of Appellee United States of America at 58-60 (emphasis by government).
 
 
 136
 After thoroughly reviewing the transcript and the applicable case law, we hold that the comments by the prosecutor did not constitute prosecutorial misconduct requiring a new trial for the appellants.
 
 
 137
 The primary question before us is whether the comments made by the prosecutor were so prejudicial as to deprive any appellant of his sixth amendment right to a fair trial. There are numerous cases in this Circuit which have held certain "response" comments by the prosecution to constitute prosecutorial misconduct requiring a new trial. See, e.g., United States v. Young, No. 81-1536, slip op. at 9-11 (10th Cir. Feb. 22, 1983), cert. granted, --- U.S. ----, 104 S.Ct. 1271, 79 L.Ed.2d 676 (1984) (prosecutor asserted personal opinion of appellant's guilt and related incorrect financial evidence); United States v. Rios, 611 F.2d 1335, 1341-43 (10th Cir.1979), cert. denied, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981) (prosecutor personally attacked defense counsel, accused defense counsel's investigator of contriving testimony, argued facts not in evidence, expressed personal belief of appellant's guilt, and referred, without basis in the record, to prosecution witnesses being in danger); United States v. Latimer, 511 F.2d 498, 502-03 (10th Cir.1975) (prosecutor argued facts not in evidence and put personal knowledge and belief before jury); United States v. Ludwig, 508 F.2d 140, 143 (10th Cir.1974) (prosecutor personally vouched for credibility of government witness). On the other hand, we have also often held that certain "response" comments by the prosecution did not deprive a defendant of a fair trial. See, e.g., United States v. Brewer, supra at 803; United States v. Bishop, 534 F.2d 214, 219-20 (10th Cir.1976); Sanchez v. Heggie, 531 F.2d 964, 967 (10th Cir.1976), cert. denied, 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976); Devine v. United States, 403 F.2d 93, 96 (10th Cir.1968), cert. denied, 394 U.S. 1003, 89 S.Ct. 1599, 22 L.Ed.2d 780 (1969).
 
 
 138
 After a review of the above-cited cases, it is obvious that to determine whether a defendant has been deprived of a fair trial, we must view the comments made in the context of the record before the jury. In the absence of a comment made by the prosecutor clearly attacking a defendant's exercise of a constitutional right (the right to remain silent, the right not to testify, etc.), we must determine whether the prosecutor's comments were enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented. See also Devine v. United States, supra at 96. We hold that the comments made by the prosecutor in the instant case did not reach that level.
 
 
 139
 In making this determination, we are reminded that a prosecutor is to be given "considerable latitude" in responding to an argument raised by his opposing advocate. United States v. Brewer, supra at 803; United States v. Bishop, supra at 220; Sanchez v. Heggie, supra at 967. In a case such as this where both sides argue vigorously and aggressively, the prosecutor's closing argument " 'need not be confined to such detached exposition as would be appropriate in a lecture.' " United States v. Bishop, supra at 220 (quoting United States v. Isaacs, 493 F.2d 1124, 1164 (7th Cir.1974), cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974)). Finally, we think that the language of the Second Circuit is instructive:
 
 
 140
 The prosecutor in the instant case was responding to what he quite reasonably believed to be attacks on the integrity of the government's case, and which impugned the good faith of the entirety of the government's agents, witnesses, and prosecutorial staff .... This rendered quite proper the relatively mild response by the Assistant United States Attorney to the defendants' vitriolic charges.
 
 
 141
 United States v. Praetorius, 622 F.2d 1054, 1061 (2d Cir.1979), cert. denied, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980).
 
 
 142
 When a comment by the prosecutor appeared to extend beyond the bounds of proper conduct, the trial court properly sustained defense counsels' objection and admonished the jury when requested. In those instances when no objection was lodged ("destructive drugs," generalized attack on the defense attorneys, and introduction of the picture into evidence), the remarks did not give rise to plain error. Those comments did not produce "serious prejudicial error" which affected an appellant's life or liberty. United States v. Guerrero, 517 F.2d 528, 531 (10th Cir.1975). Our holding is bolstered by the fact that the trial court instructed the jury that statements and arguments by the attorneys were not evidence and were not to be considered in rendering a verdict. Id. See R., Vol. XXVI at 40.
 
 F. Propriety of Sentences
 
 143
 (1) Rusty Hall:
 
 
 144
 Hall contends that even if we affirm his conviction on both counts, we should hold that the trial court erred in the sentencing procedures used for him and, thus, vacate the sentences. Under Count I of the indictment (conspiracy), Hall was fined $20,000 and sentenced to fifteen (15) years imprisonment; under Count II of the indictment (continuing criminal enterprise), Hall was fined $100,000 and sentenced to forty (40) years imprisonment. The sentences rendered are to run concurrently. Hall quotes two cases at length for his proposition: Jeffers v. United States, supra, and United States v. Lurz, 666 F.2d 69 (4th Cir.1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874, 457 U.S. 1136, 102 S.Ct. 2966, 73 L.Ed.2d 1354 (1982).
 
 
 145
 In Jeffers, a plurality of the Supreme Court held that 21 U.S.C. Sec. 846 (conspiracy) is a lesser included offense of 21 U.S.C. Sec. 848 (continuing criminal enterprise). 432 U.S. at 150, 97 S.Ct. at 2215. The defendant in Jeffers was tried separately under each statutory section; he was convicted in both instances and in the second trial on the section 848 charge, he was sentenced to life imprisonment and fined $100,000. The trial court had ordered that this sentence was to run consecutively to the previous sentence of fifteen (15) years and a $25,000 fine which he had received on the section 846 conviction. The Supreme Court was therefore concerned with the possibility of an infringement of the defendant's right against double jeopardy. The Court concluded that Congress did not intend to impose cumulative penalties under sections 846 and 848. Id. at 156-57, 97 S.Ct. at 2219-20.
 
 
 146
 In the present case, there is no problem of cumulative punishment put upon Hall. Hall was tried on both counts in one proceeding and the trial judge ordered that the sentences were to run concurrently. Thus, Hall was sentenced to a maximum of forty (40) years imprisonment, which is completely within the statutory authority for a violation of section 848 (maximum allowable is life). We are guided by the Supreme Court's language in Jeffers:
 
 
 147
 Since the Government had the right to try petitioner on the Sec. 848 indictment, the court had the power to sentence him to whatever penalty was authorized by that statute. It had no power, however, to impose on him a fine greater than the maximum permitted by Sec. 848. Thus, if petitioner received a total of $125,000 in fines on the two convictions ... he is entitled to have the fine imposed at the second trial reduced so that the two fines together do not exceed $100,000.
 
 
 148
 Id. at 157-58, 97 S.Ct. at 2219-20.
 
 
 149
 The record is unclear whether the trial court's commitment order requires Hall to pay $120,000 or $100,000. Jeffers, supra, teaches us that Hall may not be fined more than $100,000 as a result of his convictions under sections 846 and 848. We hold, in any event, that Hall's conviction and sentence of the section 846 offense must be vacated. See United States v. Gaddis, 424 U.S. 544, 546 n. 6, 549 n. 12, 96 S.Ct. 1023, 1025 n. 6, 1027 n. 12, 47 L.Ed.2d 222 (1976).
 
 
 150
 (2) Sid Bradley and Ed Beasley:
 
 
 151
 Bradley and Beasley contend that the trial court erred both in the sentences it imposed on each of them and in sentencing each of them without specifying the particular offense (marijuana conspiracy or cocaine conspiracy) upon which it based each sentence. Both appellants urge that because of these errors, the sentences imposed are subject only to conjecture regarding their propriety.
 
 
 152
 The trial court, after the jury returned a guilty verdict on Count I, sentenced Beasley to thirteen (13) years imprisonment and fined him $20,000; Bradley was sentenced to four (4) years imprisonment with a chance for parole and fined $10,000. The court recommended that Bradley be committed to a federal medical center for evaluation and treatment because of an intestinal disease from which he apparently suffers.
 
 
 153
 It is clear from the record that the sentences imposed by the trial judge were within the statutory limit. The evidence presented established, and counsel for Beasley and Bradley conceded in the sentencing hearing (R., Vol. XXVII at 40 and 60), that Beasley and Bradley were connected to at least 1,260 pounds of marijuana. Thus, even if the trial judge would have sentenced Beasley and Bradley for their parts only in the marijuana aspect of the conspiracy, Beasley's sentence is within the limit mandated under 21 U.S.C. Sec. 841(b)(6) and Bradley's sentence is within the limit mandated under either 21 U.S.C. Sec. 841(b)(6) or Sec. 841(b)(1)(B). In any event, the evidence was sufficient to associate Beasley directly to cocaine and, thus, his sentence was within the limit mandated under 21 U.S.C. Sec. 841(b)(1)(A).[8] Because the sentences imposed are within the statutory limit, we may not now disturb them on appeal. United States v. Blanton, 531 F.2d 442, 444 (10th Cir.1975), cert. denied, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976).
 
 G. Remaining Contentions
 
 154
 (1) Friedrich argues that the trial court, on two separate occasions, improperly admitted certain testimony by Clanton. Friedrich contends that much of Clanton's testimony related to drug transactions which were not made in furtherance of the conspiracy, but were made merely for his personal use. Hence, Friedrich asserts that this testimony by an alleged unindicted coconspirator is not admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Further, he urges that all of such testimony was irrelevant under Rule 401 of the Federal Rules of Evidence.
 
 
 155
 This testimony by Clanton, which was not timely objected to, related to the three separate cocaine purchases made by Clanton from Jo Hall in early 1981 in Tulsa, and to the cocaine purchase he made from Best in April, 1981. First, we hold that the elicited testimony was clearly within Rule 801(d)(2)(E) and, thus, was not hearsay. Second, the trial court did not abuse its discretion in allowing this evidence since it was highly relevant. See United States v. Carleo, 576 F.2d 846, 849 (10th Cir.1978), cert. denied, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 152 (1978).
 
 
 156
 (2) Friedrich contends the trial court committed reversible error by admitting Plaintiff's Exhibit 60, which was a photograph taken in 1979 showing Dickey and Rod Bragg sitting at a table on which there is a money bag and a mirror with some lines of cocaine on it. Friedrich argues that Exhibit 60 was both irrelevant under Rule 402 and prejudicial and misleading under Rule 403 of the Federal Rules of Evidence. We fail to see any prejudice to Friedrich by the admission of this relevant evidence.
 
 
 157
 (3) Friedrich argues that the trial court erred in refusing to strike Plaintiff's Exhibit 40, which consisted of telephone records for certain telephones in Miami, Florida. Initially, Friedrich's counsel did not object to the exhibit; several days later, however, he moved to strike the exhibit because the government, he alleges, failed to establish a nexus between the exhibit and Friedrich pursuant to Rule 104(b) of the Federal Rules of Evidence. Notwithstanding the fact that there is a dispute regarding the timeliness of Friedrich's objection to Exhibit 40, we hold that the evidence presented by the government overwhelmingly established the requisite nexus between Friedrich and the exhibit. Hence, the trial court did not abuse its discretion in denying Friedrich's motion to strike.
 
 
 158
 (4) Adams contends that the trial court erred in limiting the scope of his cross-examination of government witness James Frazer, an IRS agent. Adams's counsel was subsequently denied the opportunity to pursue the same line of questioning in his recall of Frazer. Adams asserts that this action by the trial court amounted to a violation of his sixth amendment right to call witnesses in his behalf. Generally, Adams's counsel attempted to publish portions of an affidavit by Ruth Bragg through the testimony of Frazer, who had taken the affidavit. The exchange on cross-examination was as follows:Q Mr. Frasier [sic], if you will look at your seven page affidavit taken from Ruth Bragg, there is no mention of Mr. Thomas Adams in there, is there?
 
 
 159
 THE COURT: That is beyond proper cross-examination.
 
 
 160
 MR. FLEAK: If Your Honor please, can this witness be recognized back for the defense of Mr. Adams in our case, if we can't ask him questions now?
 
 
 161
 MR. SNOKE: Your Honor, we have no objection, I think, when counsel has already expressed an interest in Mr. Frazer being called.
 
 
 162
 THE COURT: He will be available.
 
 
 163
 MR. FLEAK: Thank you.
 
 
 164
 R., Vol. XX at 142.
 
 
 165
 The exchange on recall of Mr. Frazer was as follows:
 
 
 166
 Q Sir, I place before you two affidavits and I want to ask you did you sign and witness an affidavit of Ruth Bragg in Yuma, Arizona, dated 5-6-82?
 
 
 167
 A Yes, sir.
 
 
 168
 Q And on page 7 of that affidavit did Ms. Bragg--
 
 
 169
 MR. WILLIAMS: At this time I would object to any reference with regard to the affidavit at this time.
 
 
 170
 (The following took place at the bench and outside the hearing of open court.)
 
 
 171
 THE COURT: What is the purpose of the question?
 
 
 172
 MR. FLEAK: Your Honor, this affidavit was signed--this was signed by the witness Ruth Bragg on 5-6-82, seven days prior to Rodney Bragg signing his affidavit and I want to bring out there is no mention whatsoever of my client Tom Adams in this affidavit. That is the sole purpose of this.
 
 
 173
 THE COURT: Objection sustained.
 
 
 174
 R., Vol. XXIV at 49-50.
 
 
 175
 We have often held that the trial court has broad discretion to limit the scope of cross-examination. See, e.g., United States v. Haro, 573 F.2d 661, 667 (10th Cir.1978), cert. denied, 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 155 (1978); Foster v. United States, 282 F.2d 222, 224 (10th Cir.1960). It is clear from the record that counsel for Adams had ample opportunity to impeach Ruth Bragg through recall or cross-examination of her. It was improper for counsel to impeach Bragg by having a third party read or testify from an affidavit not admitted into evidence. Thus, we hold that the trial court did not abuse its discretion in denying this line of questioning by counsel for Adams.
 
 
 176
 (5) We have carefully studied the remaining contentions raised by the appellants on appeal and find them to be without merit.
 
 
 177
 WE AFFIRM.
 
 
 178
 McKAY, Circuit Judge, concurring in part and dissenting in part:
 
 
 179
 I concur with the majority's disposition of this case, with the exception of its holding that there was sufficient evidence to support Mr. Friedrich's conviction for conspiracy. Additionally, I believe that the trial court's denial of Mr. Friedrich's motion to sever was improper.
 
 
 180
 I have set out elsewhere my continuing deep concern for the loss of a disciplined approach in these drug conspiracy cases. See United States v. Heath, 580 F.2d 1011 (10th Cir.1978) (McKay, J., dissenting). Certain aspects of the court's analysis in this case require that I reiterate my concern.
 
 
 181
 The only element that distinguishes the crime of conspiracy from all other substantive crimes is the element of agreement--not knowledge--to accomplish a common task. Although the Supreme Court has recognized that the agreement need not be explicit, but rather can be inferred from circumstantial evidence, see Direct Sales Co. v. United States, 319 U.S. 703, 711-14, 63 S.Ct. 1265, 1269-71, 87 L.Ed. 1674 (1943), the Court has not lost sight of the fact that the "agreement remains the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." Iannelli v. United States, 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1289 n. 10, 43 L.Ed.2d 616 (1975) (citations omitted).
 
 
 182
 In United States v. Dumas, 688 F.2d 84, 86 (10th Cir.1982), this court acknowledged that the gist of the offense of conspiracy is the agreement to commit an unlawful act. The court further recognized that a defendant could not be convicted of conspiracy without knowledge of the conspiracy's objective. Id. Yet, with regard to the element of agreement in the case now before us, the majority's opinion loses sight of this essential element.
 
 
 183
 In United States v. Watson, 594 F.2d 1330, 1337 (10th Cir.1979), this court noted that the mere existence of a buyer-seller relationship, without more, is insufficient to establish, or tie one into a conspiracy. The court there explained that
 
 
 184
 for a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the narcotics laws, there must be independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy, or the single act must be one from which such knowledge may be inferred. For the inference of intent to join a conspiracy to be made from proof of a single act, it must be such as to show the actor's knowledge of the existence and scope of the conspiracy, and his belief that the benefit to be derived from his action depends on the success of the acts of others.
 
 
 185
 Id. (citations omitted). In my dissent in Watson, I expressed the view that
 
 
 186
 [o]ne does not have to have any sympathy for drug dealers to express a deep concern about the erosion of fundamental doctrines of liberty when that erosion occurs in cases dealing with drug dealers. This case represents one more example of the continuing erosion of the concept that "[g]uilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application." Kotteakos v. United States, 328 U.S. 750, 772, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).
 
 
 187
 * * *
 
 
 188
 * * *
 
 
 189
 In this case all that the evidence shows is that one Thompson was a major drug dealer in Tulsa, Oklahoma, and that these defendants obtained their supplies (apparently for resale) from him. If we take seriously our stated standard that criminal cases must be proved beyond a reasonable doubt, I do not believe that this record supports a finding that these customers of one dealer were connected together in a common conspiracy. What is missing is the "rim of the wheel to enclose the spokes" of a conspiracy. See Kotteakos v. United States, 328 U.S. at 755, 66 S.Ct. at 1243. Even more alarming is the absence of any evidence under either a civil or criminal standard of proof which would show that these defendants were knowingly involved by agreement with James Anderson--Thompson's California supplier.
 
 
 190
 594 F.2d at 1344-45. The principles and concerns I raised in Watson are equally applicable to the facts before us.
 
 
 191
 Appellant Friedrich was involved in only two transactions. He sold two kilograms of cocaine to a government witness (Doc Clanton) on two separate occasions in Miami, Florida. Outside of these two sales there is little evidence to support Mr. Friedrich's participation in or knowledge of a conspiracy to distribute drugs. At most he was guilty of an illicit sale, but there is no evidence to show he had "knowledge of the broader conspiracy," Watson, 594 F.2d at 1337, or of the conspiracy's objective, United States v. Dumas, 688 F.2d 84, 86 (10th Cir.1982).
 
 
 192
 The government alleges, without support in the record, that Mr. Friedrich was introduced to Mr. Clanton by Rusty Hall's* wife, Jo Hall, as "Rusty's source of cocaine," see ante at 584. The only other evidence that would link Mr. Friedrich to Mr. Hall is a series of fifty-one telephone calls made from Mr. Friedrich's home to Rusty Hall's home. However, mere telephone calls between two parties fail to establish a conspiracy. United States v. Galvan, 693 F.2d 417, 419-20 (5th Cir.1982).
 
 
 193
 While the majority recognizes both the Galvan rule and the fact that testimony in the record fails to support the government's allegation that Mr. Friedrich was introduced as "Rusty Hall's source of cocaine," the majority nonetheless holds that the evidence is sufficient to connect Mr. Friedrich to the overall conspiracy. The majority concludes that "[b]ecause large quantities of cocaine were being distributed, we will presume that Friedrich, as a major supplier had knowledge of his part in a broad venture." Ante at 585. The law will not support a charge of conspiracy based solely on an illicit sale, even where the seller knows that the buyer intends to use the goods unlawfully. See Direct Sales Co. v. United States, 319 U.S. 703, 712, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943). Neither the record in this case, our previous cases, nor a disciplined examination of what constitutes an agreement support the conclusion that Mr. Friedrich was properly charged with all other appellants in a single conspiracy.
 
 
 194
 Indeed, if this is the only evidence in the record to support Mr. Friedrich's "involvement" in the conspiracy, I fail to see how he can be a coconspirator, especially with no evidence of agreement, nor evidence of Mr. Friedrich's knowledge of the broader conspiracy. Additionally, with such thin evidence Mr. Friedrich's joinder in this case seems more and more prejudicial--in fact, improper. However, while joinder might have been prejudicial to Mr. Friedrich individually, his joinder was not legally prejudicial to the other appellants.
 
 
 195
 Therefore, I must respectfully dissent from that part of the court's opinion that affirms appellant Friedrich's conviction.
 
 
 
 [1]
 Taylor, originally indicted as a coconspirator, was later severed from this trial when his attorney became ill (R., Vol. XVII at 14-15)
 
 
 [2]
 Joe Hill was eventually killed in an airplane crash in Colombia (R., Vol. XIII at 143)
 
 
 [3]
 At the time of trial, Jo Hall, a/k/a Jo O'Brian, was an indicted coconspirator but the warrant issued for her arrest had yet to be served on her. See Initial Brief of Appellant Friedrich at 1 n. 2
 
 
 [4]
 Section 846 makes it a criminal act for any person to conspire to commit any offense in subchapter I (Control and Enforcement) of chapter 13 (Drug Abuse Prevention and Control), Title 21 of the United States Code. The specific offense that the appellants are charged with is conspiring to violate 21 U.S.C. Sec. 841(a)(1), which declares that possession of controlled substances, i.e., marijuana or cocaine, with intent to distribute them shall be unlawful
 
 
 [5]
 Appellants Hall, Nichols, Dickey, Smith, and Adams each contend the trial court erred in giving the jury instruction that it did regarding the issue of single versus multiple conspiracies. A review of the jury instructions given by the trial court lead us to the conclusion that no error was committed (See R., Vol. XXVI at 17-24)
 
 
 [6]
 21 U.S.C. Sec. 848(b) provides:
 For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if--
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 (B) from which such person obtains substantial income or resources.
 
 
 [7]
 Hall further contends that section 848 is unconstitutionally vague and, thus, deprives him of due process of law. Specifically, he asserts that the terms "continuing series," "substantial income" and "in concert" are so vague that they fail to adequately warn an individual of the criminal consequences of his action. However, we agree with the Second and Sixth Circuits that section 848 is not void for vagueness on its face. See United States v. Sperling, 506 F.2d 1323, 1343 (2d Cir.1974); United States v. Collier, 493 F.2d 327, 329 (6th Cir.1974), cert. denied, 419 U.S. 831, 95 S.Ct. 56, 42 L.Ed.2d 57 (1974)
 
 
 [8]
 21 U.S.C. Secs. 841(b)(1)(A), (b)(1)(B) and (b)(6) provide in pertinent part:
 (b) Except as otherwise provided in section 845 of this title, any person who violates subsection (a) of this section shall be sentenced as follows:
 (1)(A) In the case of a controlled substance in schedule I or II which is a narcotic drug [cocaine], such person shall be sentenced to a term of imprisonment of not more than 15 years, a fine of not more than $25,000, or both ....
 (B) In the case of a controlled substance in schedule I or II which is not a narcotic drug [marijuana] ... such person shall, except as provided in paragraphs (4), (5), and (6) of this subsection, be sentenced to a term of imprisonment of not more than 5 years, a fine of not more than $15,000, or both ....
 ....
 (6) In the case of a violation of subsection (a) of this section involving a quantity of marihuana exceeding 1,000 pounds, such person shall be sentenced to a term of imprisonment of not more than 15 years, and in addition, may be fined not more than $125,000....
 
 
 *
 Rusty Hall was the "linchpin" in the conspiracy