**UNITED STATES of America, Plaintiff,**

v.

**Julio ZAVALA, Defendant.**

**No. CR–83–0154 RFP.**

United States District Court,
N.D. California.

March 19, 1985.

Mark Zanides, James Lassart, Asst. U.S. Attys., San Francisco, Cal., for plaintiff.

Judd C. Iversen, Marvin S. Cahn, Law Offices of Judd Iversen, San Francisco, Cal., for defendant.

## FINDING OF FACT AND CONCLUSIONS OF LAW

PECKHAM, Chief Judge.

### INTRODUCTION:

The government is prosecuting the defendant in the above-captioned case for counts three through eight, and count twenty-five of the March 1983 indictment. Counts three through eight allege that Zavala used a telephone, in committing, causing or facilitating the commission of a felony narcotics violation, in violation of 21 U.S.C. § 843(b). In count twenty-five, the government alleges that Zavala violated 21 U.S.C. § 848, the continuing criminal enterprise (CCE) statute.

The trial, a bench trial, began in late October of 1984 and consisted partly of stipulated facts and partly of live testimony. Closing argument was heard on February 22, 1984. After an examination of the record in this case,[1] and a consideration of the legal arguments by counsel, the court hereby finds Julio Zavala GUILTY of counts three (3), four (4), five (5), six (6), eight (8), and twenty-five (25). The court hereby finds the defendant NOT GUILTY of count seven (7).

The court also hereby orders dismissed count one (1) of the indictment against Zavala and vacates his plea of guilty to this count.

The following memorandum sets forth the factual and legal basis for this court's findings, pursuant to Fed.Rules Crim.Pro. rule 23(c). The court considers each count in turn, making its findings of fact and conclusions of law as it takes up each count separately.

### COUNTS THREE THROUGH EIGHT:

Section 843(b) of Title 21 of the U.S.C. provides:

(b) It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection....

The indictment alleges that Zavala had six separate phone conversations from August 28, 1982 to September 23, 1982, that violated § 843(b). These phone conversations were all allegedly in furtherance of a variety of federal narcotics laws, including 21 U.S.C. § 963 (attempt or conspiracy to violate laws against importing or exporting

---

1. The record in this trial consists of:

1. Stipulation of facts for the government's case (SFG), and exhibits incorporated therein,
2. Stipulation of facts regarding the defendant's testimony (SFZ),
3. Live testimony taken on: November 27–28, 1984, and on December 18–20, 1984 (citations to the Reporter's Transcript of testimony, as "R.T."), and exhibits entered into evidence on these days,
4. Briefs by each side on count twenty-five (25),
 a. Government's brief filed on November 26, 1984.
 b. Defendant's brief filed on November 27, 1984.
5. Closing briefs:
 a. Government's memorandum regarding proof of violations by Zavala of 21 U.S.C. § 848 and 21 U.S.C. § 843(b).
 b. Defendant's memorandum of proof.
 c. Government's reply memorandum of proof.
6. Closing arguments held on February 22, 1985.

controlled substances), 21 U.S.C. § 952 (importation of controlled substances), 21 U.S.C. § 846 (attempt or conspiracy to violate laws regarding controlled substances), and 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

The government has conceded that it has not proved count seven. The defendant has conceded that the government has met its burden of proof on counts four and eight. The court will address briefly counts four and eight to show that the record does support such a concession. Counts three, five, and six are in dispute and the court will concentrate on these communication counts.

The elements of a § 843(b) crime are "(1) knowing or intentional (2) use of a 'communication facility' (3) to facilitate the commission of a felony under 21 U.S.C. § 801–966." *United States v. Barnes*, 681 F.2d 717, 723 (11th Cir.), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 802, *modified on other grounds*, 694 F.2d 233 (11th Cir.1982); *United States v. Rey*, 641 F.2d 222, 224 n. 6 (5th Cir.), *cert. denied* 454 U.S. 861, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981). No question has been raised that the defendant knowingly and intentionally used communication facilities on the days charged in counts three, five, and six. The defendant does not deny that he spoke to the people charged in the indictment on those days. Moreover, the parties have stipulated that the translations of conversations referred to in the Government's Stipulation of Facts (SFG), including the conversations charged in counts three, five, and six, are "substantially accurate." SFG at 5, line 3–5.

The parties do dispute the interpretation the court should place on the contents of these conversations. In order to prove that the conversations facilitated the commission of a narcotics offense, the government must show that the conversation "comes within the common meaning of facilitate— 'to make easier' or less difficult, or to assist or aid." *United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir.1981), *cert. denied* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, and 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982).

The court proceeds to an examination of each § 843(b) count.

*1. Count three:* In count three, the government alleges a conversation on August 28, 1982, between Zavala and Ernesto Linsig-Cabellero. In this conversation, the defendant calls his house on Barneson Street in San Mateo from Costa Rica. Mario Leon initially answers the phone,[2] then the defendant talks with Lydia Guiterrez, his housekeeper. The defendant speaks with Ernesto Linsig-Cabellero last. In this conversation, by his own testimony, the defendant asks Linsig about Linsig's efforts to collect drug debts owed to the defendant. SFZ at 6, lines 15–16. The translations of the conversations support this conclusion. In particular, the defendant asked Linsig about the debts owed by Mario Leon, "Chino", and Tom.

Linsig also tells the defendant that some customers want a "shirt," which Linsig has testified to being an ounce of cocaine. SFG at 12, line 8. He also tells the defendant that he is going to give out "seven." The defendant instructs Linsig not to give any cocaine to this particular unnamed customer(s) until that customer pays Linsig. Linsig says the customer promised payment and the defendant says, "[b]ut that is what he told me last time." Translations

---

**2.** The summary of the conversations in the government's set of stipulated facts says that Ernesto Linsig-Cabellero tells Zavala about bills for a BMW and the telephone. SFG at 11. The summary also says that Zavala asks Linsig if he had any "harina," (flour, a word for money, SFG at 20) at the house. A review of the translation of the count three (3) call reveals, however, that Zavala is conversing with Mario Leon at this point.

The court finds that the summary of the count three conversation in the stipulation is in error, though the court understands that these summaries of conversations are meant as aids to the court and not as evidence of the contents of the conversations. The court also notes that this discrepency in the summary and the translation is immaterial to the court's finding of guilty on count three. The incriminating portion of the call is the defendant's discussion with Linsig.

accompanying SFG, conversation #15, MALE line, NDC 86, August 28, 1982.

The defendant also instructs Linsig to use "Charlene" if he gets any cocaine.

The findings of fact prove a violation of 21 U.S.C. § 843(b) in this August 28, 1982 conversation. The conversation facilitated the defendant's conspiracy with Linsig to distribute cocaine. The defendant has stipulated that this conspiracy existed. SFG at 1–2. The discussion regarding the collection of debts assists this conspiracy because one of the main techniques the defendant used to distribute cocaine depended on the successful collection of these debts. The defendant has stipulated that he "fronted" drugs, that is, distributed drugs to persons without first receiving payment, in anticipation of payments to be received when his customers got paid by their customers. SFG at 3, lines 11–21. Thus, in a fronted transaction, the act of distribution is not complete until the customer finally pays.

■ Unless the defendant was able to collect his money for the fronted drugs, he could not continue in his business. First, unless he collected the debts, obviously he would not make any money. Second, unless the defendant collected his debts, he would not be able to pay his supplier of drugs, Alvaro Carvajal-Minota. If the defendant did not pay Carvajal-Minota, he would no longer be able to buy cocaine from this source. A telephone conversation in which Zavala checks up on Linsig's collection efforts aids or assists the conspiracy to distribute cocaine, and constitutes a violation of 21 U.S.C. § 843(b).

■ Moreover, the facts show that Zavala instructs Linsig regarding future drug sales. The court has in mind the defendant's instructions to Linsig not to give the unnamed customer who wants a "shirt," any cocaine until he pays. The defendant is not, as he urges the court to conclude, telling Linsig not to sell drugs. Defendant's Memorandum of Proof, filed 2/5/85, at 34. Rather, the court understands the defendant to be telling Linsig not to sell drugs to this customer in a certain manner, i.e., by fronting. The difference in these two instructions is that the latter is clearly a violation of 21 U.S.C. § 843(b).

■ In addition, the court finds that the defendant's instructions to Linsig to use Charlene for future drug distribution proves count three. Again, instructions about how to conduct future drug distributions facilitates the conspiracy to distribute drugs. Such planning surely is intended to make the conspiracy, and eventual distribution, easier than if the conspirators did not discuss future plans.

■ *2. Count Four:* In count four, the government alleges a conversation on September 5, 1982 between the defendant and Ernesto Linsig-Cabellero. The defendant concedes that the government has proven count four. The court also finds that evidence in the record supports such a concession.

The evidence of count four includes uncontradicted testimony of Linsig that he and the defendant were discussing the measurement and distribution of cocaine left at the defendant's house in the September 5, 1982, call. SFG at 15. The court also has examined the translations of the conversations and finds it is clear that the defendant and Linsig were discussing these matters.

*3. Count Five:* In count five, the government alleges a conversation on September 9, 1982, between the defendant and Ernesto Linsig-Cabellero. The contents of the conversations are basically uncontroverted. The defendant calls Linsig and Linsig tells the defendant that he just sold drugs to "Rita." The defendant also talks to Rita and tells her he is mad at her brother because her brother has not paid Zavala for drugs Zavala sold him. The court finds that he wanted Rita to relay a message to her brother that the defendant is looking for his money. The defendant, in his conversation with Rita, is engaged in a drug money collection effort.

■ The September 9, 1982, conversation amounts to a report by Linsig to the de-

fendant on a recently completed drug sale. The court concludes that this is sufficient to establish a violation of § 843(b). The defendant says that, since the drug transaction with Rita was obviously completed at the time of the conversation, the conversation could not have "facilitated" the sale. The government replies that the charge is that the call facilitated an ongoing drug conspiracy, not just the past transaction with Rita.

The court agrees with the government's position. The defendant has stipulated that he conspired with many people from June 1981 to February 15, 1983, including Linsig. SFG at 1–2. The crime that this conversation facilitated was an ongoing conspiracy, not just a conspiracy to distribute drugs to Rita on a certain date in September of 1982. Reports on successful drug transactions surely assist the conspiracy inasmuch as these reports encourage the continuance of the conspiracy.

The court explicitly does not rely on its findings of fact regarding the defendant's conversation with Rita, to find a § 843(b) violation in count five. The indictment only alleges that his conversation with Linsig violated § 843(b), and the court has confined itself to a consideration of the facts of the Linsig conversation.

*4. Count six:* In count six, the government charges that a September 13, 1982, conversation between the defendant and Angela Cabezas facilitated his conspiracy to distribute drugs. The defendant has stipulated that he conspired with Angela and Carlos Cabezas (Angela's husband), to distribute cocaine. SFG at 1–2. Both sides agree that in the September 13, 1982, conversation, Angela Cabezas calls the defend-

ant to tell him that a representative of Alvaro Carvajal-Minota is going to come by the Cabezas house to pick up money that Zavala owes Alvaro. The defendant has stipulated that he also conspired with Carvajal-Minota to distribute cocaine, SFG at 1–2, and that he bought cocaine from Alvaro. SFG at 4. The record is replete with testimony that Alvaro fronted drugs to the defendant and that the defendant was, especially in the summer of 1982, having trouble paying Alvaro. 1 R.T. 83–84 (defendant's testimony that he owed Alvaro $70,000 in August of 1982); SFG at 21 (testimony of Mario Morales); SFG at 31 (testimony of Carlos Cabezas).

The defendant argues that this conversation did not facilitate Zavala's drug business. Rather, Angela's call facilitated Alvaro Carvajal-Minota's drug business. The government replies that information regarding Alvero's collection efforts helped Zavala's business because Zavala needed to keep Alvero satisfied in order to insure a continued supply of cocaine.

The court finds that the call facilitated the defendant's conspiracy to distribute drugs with Alvaro Carvaja-Minota and Angela and Carlos Cabezas.[3] The defendant's conversation with Angela about Alvaro's debt collection facilitated this conspiracy to distribute cocaine because, as the government notes, it was important for the defendant to know when Alvero was going to send over people to collect drug money. Zavala had to pay Alvaro in order to continue to get cocaine from him. Thus, discussions with co-conspirators regarding the defendant's debts, aid or assist the defendant's drug distribution conspiracy.[4]

---

**3.** The fact that the defendant did not initiate the call is immaterial for a § 843(b) crime. *United States v. Cordero,* 668 F.2d 32, 43 n. 16 (1st Cir.1981). In *Cordero,* the defendant argued that she could not be held guilty of a § 843(b) violation because she only responded to the calls of a government agent. The court said, "[w]e are aware of no authority which suggests the term 'use' in the statute refers solely to 'placing' calls and leaves unpunished use of the telephone by the receiver of a call." *Id.*

The court in *Cordero,* cited *United States v. Jones,* 612 F.2d 453, 456 (9th Cir.1979), cert. denied, 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980), to support this conclusion. In *Jones,* the defendant did not even physically touch the phone in the call for which he was convicted. Rather, he instructed one of his underlyings to place a phone call. The court in *Jones,* found that he had violated § 843(b) by doing so. *Id.*

**4.** Moreover, even if the court finds that the call facilitated Alvaro Carvajal-Minota's drug distribution, as the defendant urges, this facilitation

### 5. Count seven:

The government concedes that it has not met its burden of proof on count seven, an alleged September 22, 1982, conversation between the defendant and Doris Saloman.

### 6. Count eight:

▪ The defendant acknowledges proof of count eight—a September 23, 1982, conversation between Zavala and Carlos Cabezas. The court finds, upon an examination of the transcript of this call, that the defendant and Carlos are discussing, among other topics, the money they need to collect to buy cocaine in an impending deal. This conversation aided the defendant's conspiracy with Carlos to import cocaine, a conspiracy to which the defendant has stipulated. SFG at 1–2.

The court turns next to an examination of count twenty-five (25), that charges the defendant with violating 21 U.S.C. § 848.

### CONTINUING CRIMINAL ENTERPRISE:

In order to prove that a defendant has engaged in a continuing criminal enterprise, in violation of 21 U.S.C. § 848, the government must show:

(1) the defendant's conduct constituted a felony violation of federal narcotics laws,

(2) the described conduct occurred as part of a continuing series of violations,

(3) the defendant undertook the activity in concert with five or more persons,

(4) the defendant acted as organizer, supervisor or manager of the criminal enterprise, and

(5) the defendant obtained substantial income or resources from the purported enterprise.

also arguably violates § 843(b). At least one court has held that "section 843(b), however, is not so narrow as to require that the facilitator commit the facilitated offense. The statute can be satisfied by the knowing or intentional use of the telephone to facilitate another person's commission of an offense." *United States v. Rey,* 641 F.2d 222, 225 n. 6 (5th Cir.), *cert. denied,*

*United States v. Sterling,* 742 F.2d 521, 525 (9th Cir.1984). The parties dispute most vigorously whether the defendant organized, supervised, or managed five individuals. The court examines each of the elements in turn, stating its findings of fact and conclusions of law for each element.

(1) The defendant's conduct must violate federal felony narcotics laws. These laws are codified at 21 U.S.C. § 841 *et seq.* and at 21 U.S.C. § 951 *et seq.* No dispute exists over this element.

(2) The defendant must engage in a "series of violations" of these federal narcotics laws. The Ninth Circuit has interpreted this phrase to mean three or more federal narcotics violations. *United States v. Valenzuela,* 596 F.2d 1361, 1367 (9th Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979).

The defendant has pleaded guilty to count nineteen (19) of the indictment which charges him with possession with intent to distribute 364 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1). The government, then, must prove that Zavala committed two other violations of federal narcotics laws punishable as felonies. As noted above, the indictment charges him with six counts of using a communication facility in committing or facilitating a narcotics violation. The defendant has conceded to counts four and eight, which completes the government's showing of three violations. Moreover, the court has found the defendant guilty to counts three, five, and six in the discussion above.

▪ The defendant argues that the government may not use these telephone

454 U.S. 861, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981).

The discussion Zavala had with Angela Cabezas, even if she is viewed as a messenger for Alvaro, aids Alvaro's effort to collect drug debts. Just as discussions between Zavala and Linsig regarding collection are crucial to the maintenance of Zavala's drug business, so too this

offenses to support a CCE.[5] The language of the statute, however, seems clearly to the contrary, allowing the government to show that the defendant "violated *any* provision of this subchapter or subchapter II of this chapter the punishment for which is a felony." 21 U.S.C. § 848(b)(1) (emphasis added). Section 843(b) is in the relevant subchapter of Title 21. The Ninth Circuit has never had occassion to decide whether a telephone count may serve as a predicate offense. The Second and Fourth Circuits, however, have found that the telephone counts may serve as a predicate offense for a CCE. *United States v. Young*, 745 F.2d 733, 755 (2d Cir.1984); *United States v. Webster*, 639 F.2d 174, 181 (4th Cir.), *cert. denied* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *modified on other grounds*, 669 F.2d 185 (4th Cir.), *cert. de-*

*nied* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).

The defendant has also pleaded guilty to count one, conspiracy to import and distribute cocaine. The government recognizes that it is unclear in the Ninth Circuit whether a conspiracy may serve as one of the series of violations. In *United States v. Sterling*, 742 F.2d 521 (9th Cir.1984), the defendant was convicted of five federal narcotics offenses, including two counts of conspiracy. The defendant argued that he could not be convicted on a CCE count because conspiracy counts cannot be the basis for a CCE violation. The Ninth Circuit, without explicitly ruling whether a conspiracy count may form the basis of a CCE violation, said that, because the jury found the defendant guilty of three other substantive felony narcotics violations that could serve as predicate offenses,[6] the CCE conviction would stand.

conversation about Zavala's debt with Alvaro aided Alvaro's conspiracy to distribute drugs.

5. The defendant argues that even if a § 843(b) offense could be utilized as a predicate act in a continuing criminal enterprise prosecution, the government has precluded itself from doing so in the case at bar. The defendant complains about a bill of particulars filed 9/27/83, in a section entitled "Explication of Crimes Alleged to Have Been Facilitated by Julio Zavala's Use of Communication Facilities," in which the government said:

Evidence of the following crimes committed by Julio Zavala will be introduced against him to provide the predicate series of offenses charged in Count Twenty-Five of the Indictment: conspiracy to possess cocaine with intent to distribute; possession of cocaine with intent to distribute; conspiracy to import cocaine and importation of cocaine.

The defendant argues that permitting the government to rely on the § 843(b) counts now would allow an impermissible variance.

The government responds that the bill of particulars was filed in response to the court's order filed 9/6/83. In this September 6, 1983, order, the court denied the defendant's motion for a bill of particulars, except that the court ordered the government to provide the names of alleged conspirators not named in the indictment and to specify the crimes facilitated by the use of the telephone. The government's bill of particulars lists the identities of the co-conspirators. The government also admits that in subsection B of the bill of particulars, the bill mistakenly states that evidence of the crimes lists therein would be introduced against him to

provide the predicate series of offenses charged in Count 25 of the indictment.

The government argues that the self contradictory statement of the bill or particulars, in light of the court's order, should have alerted the defendant to the government's error. Moreover, the government argues that the defendant was not prejudiced by the error because he put the government to its proof on counts three through eight.

The court agrees that the bill of particulars contained an error. The court had not ordered the government to list what offenses were to be used to establish the CCE. Rather, the court ordered the government to tell the defendant what crimes the telephone counts allegedly facilitated. Moreover, the court finds that the defendant was not prejudiced by the error because he was not entitled to have the government specify what crimes made up the continuing series of crimes for the CCE. In addition, the government was put to proof, and did establish beyond a reasonable doubt, the facts of the phone calls charged in counts three, four, five, six, and eight.

Finally, the court notes that it need not even rely on the § 843(b) counts to find that the government has proven a continuing series of violations. As discussed in the text, the government's evidence supports a finding that the defendant was involved in numerous drug distributions from 1981 to February of 1983.

6. In *Sterling*, the defendant was convicted of two counts of importing marijuana, 21 U.S.C. § 960, one count of possession with intent to distribute, 21 U.S.C. § 841, one count of conspiracy to possess with intent to distribute, 21

The court need not rely on this conspiracy count as a predicate offense because the defendant has pleaded guilty to the possession count and has conceded the two telephone counts, and because the *Sterling* decision indicates that the Ninth Circuit might not allow the use of conspiracy as a predicate offense, if called upon to decide. *But see United States v. Young*, 745 F.2d 733, 748–52 (2d Cir.1984) (excellent review of recent circuit law, concluding that the better result is that a § 846 conspiracy may serve as a predicate offense for a CCE count).[7]

■ One circuit has said that a defendant cannot be *punished* for predicate offenses that establish the CCE and the CCE also. *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984). Even if the Ninth Circuit should adopt the rule in *Oberski*,[8] the court finds that the defendant committed numerous other narcotics crimes, uncharged in the indictment, from June 1981 to February 1983, that may serve as predicate offenses for the CCE.

Contrary to the defendant's assertions, the indictment need not specifically list the alleged violations that make up the continuing series of violations. All the Ninth Circuit requires is that the evidence show that the defendant committed three felony drug offenses. *United States v. Sterling*, 742 F.2d 521, 526 (9th Cir.1984) ("we agree with the Second Circuit that there is no legal requirement that the violations which make up the continuing series be specifically listed in the indictment). Zavala has stipulated that:

> U.S.C. § 846, and one count of conspiracy to import marijuana, 21 U.S.C. § 963. 742 F.2d at 523.

During the course of the conspiracy to distribute cocaine, Julio Zavala distributed the cocaine to certain persons without first receiving payment for, [sic] it in anticipation of payment to be received by him upon receipt by these persons of payment from their customers. The parties further stipulate that Julio Zavala, directly and indirectly, distributed cocaine in the foregoing manner to, among others, the following persons: Manuel "El Gordo" Hererra, Mario Leon, Thomas Benson, Jorge Portugal ("El Chino"), Charlene Rizzo, Eric, Roxanna, Chepe, Rita, Palani, Miki, Turbo, Peter, Mario, Larry, Norman, "Salvadoreno", and Roger Perez.

SFG at 3.

These distributions of cocaine, in violation of 21 U.S.C. § 841(a)(1), are numerous enough to satisfy the requirement that the defendant engaged in a continuing series of violations.

■ (3) The defendant must have undertaken the activity in concert with five or more persons. The Supreme Court has held that the words, "in concert," mean "agreement in design or plan." *Jeffers v. United States*, 432 U.S. 137, 148–49, 97 S.Ct. 2207, 2214–15, 53 L.Ed.2d 168 (1977). *Accord, United States v. Valenzuela*, 596 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979).

The government need not show that the defendant acted with five people on each predicate offense. The government need only show that Zavala worked in concert with five persons during the series of violations, and as to them he served in a super-

---

**7.** The Ninth Circuit has ruled that the defendant cannot be convicted and punished for both a CCE and a § 846 conspiracy charge. *United States v. Smith*, 690 F.2d 748, 750 (9th Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983). In light of the court's finding of guilty on the CCE count, it must dismiss count one of the indictment and vacate the defendant's plea of guilty to this count. The

court has already taken note of this in an order filed 6/12/84.

**8.** It is extremely doubtful that the Ninth Circuit would adopt the *Oberski* rule. *See e.g., United States v. Sterling, supra*, in which the court allowed convictions on a CCE and the three offenses which served as predicate crimes, without any suggestion that this would be improper. *See id.*, at 524, for the court's recitation of the defendant's sentences on each count. And note, the defendant was not sentenced on the conspiracy counts. *Id.*

visory capacity (an element considered below). *United States v. Smith*, 690 F.2d 748, 750 (9th Cir.1982)(quoting *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983). Finally, the government need not show that he acted in concert in the same state or geographic area. *See United States v. Fry*, 413 F.Supp. 1269, 1272–73 (E.D.Mich 1976), *aff'd*, 559 F.2d 1221 (6th Cir.1977).

There is clear evidence that Zavala worked in concert with five persons during the continuing violations and the defendant concedes that the government has established this element. Defendant's Memorandum of Proof, filed 2/5/85 at 13.

(4) But, the defendant must occupy a "position of organizer, a supervisory position, or any other position of management," with respect to these five persons and the defendant vigorously denies that the government has established this element. These words are to be given their ordinary meaning. *United States v. Ray*, 731 F.2d 1361, 1367 (9th Cir.1984). The Ninth Circuit has suggested that the court interpret these words as they are understood in the business community. *Id.*, citing *United States v. Valenzuela*, 596 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979) (which upheld the language of the CCE statute against a vagueness attack); *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984) ("The terms 'organize,' 'supervise,' and 'manage' are not technical terms and are interpreted according to their ordinary meaning."); *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir. 1980). Thus, the government does not need to show that the defendant *controlled* the activity of those whom he organized, to provide this fourth element. *United States v. Ray, supra*, 731 F.2d at 1367.

The statute has been called a "King Pin" statute, *see, e.g., United States v. Sinito*, 723 F.2d 1250, 1261 (6th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 86, 83

L.Ed.2d 33 (1984); *United States v. Webster, supra*, 639 F.2d at 180. This is, of course, the language in which the defendant describes the law because the government does not contend here that the defendant was the top organizer in the drug dealing ring. Clearly the CCE does cover the heads of highly structured drug distribution organizations. *See, e.g., United States v. Sinito, supra; United States v. Johnson*, 575 F.2d 1347, 1358 (5th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979). But it is just as clear that the CCE applies to less structured enterprises, *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984); *United States v. Dickey*, 736 F.2d 571, 587 (10th Cir.1984); *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir.1980), and to those persons who are middle-level managers. The defendant need not have been the sole manager of the alleged continuing criminal enterprise. *United States v. Phillips*, 664 F.2d 971, 1034 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, and 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). The defendant need not have been the "dominant" organizer, "as long as [the defendant] was in some managerial position." *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.1982); *United States. v. Becton*, 751 F.2d 250, 255 (8th Cir.1984).

The defendant contests most vigorously whether the government has met its burden here. The court examines the persons whom the government alleges the defendant organized managed or supervised by rough categories: 1) drug money collectors and drug distributors, 2) "helpers", and 3) customers.

 Initially, the court finds that Zavala supervised Ernesto Linsig-Cabellero. There is a substantial amount of evidence to support such a finding. First, the court has the defendant's admission that he did supervise, organize, and manage Linsig. 1 R.T. at 61. Because the court uses the words "supervise, manage, or organize" in their ordinary senses, an admission by the defendant that he supervised Linsig is fac-

tual evidence for such a finding. *United States v. Oberski*, 734 F.2d 1030, 1032 (5th Cir.1984) (defendant pleaded guilty to a CCE count, court found factual basis for such a plea, including the defendant's admission in court that he supervised people). The court also has the extensive and detailed testimony by Linsig of his activities for the defendant. SFG at 6–10.

Thus, the government need only prove that Zavala organized, supervised, or managed four other persons.

**1. Drug money collectors and distributors:**

■ The government presented evidence to show that a number of people delivered cocaine to the defendant's customers and collected money from customers who owed money to Zavala. To the extent that the government proves that a person collected money or delivered drugs for the defendant, the court will find that the defendant controlled that person. Sending people to do the actual distribution tasks clearly comes within the meaning of terms supervise, organize, or manage in the CCE. *See, e.g., United States v. Adamo*, 742 F.2d 927, 933 (6th Cir.1984) ("muley" or drug courier a subordinate to the defendant); *United States v. Samuelson*, 697 F.2d 255, 259 (8th Cir.1983) (that defendant arranged payment and delivery of drugs was evidence of his position as manager), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1314, 79 L.Ed.2d 711 (1984); *United States v. Mannino*, 635 F.2d 110, 117 (2d Cir.1980) (that defendant's brother acted on his behalf to collect money from the defendant's drug customer, evidence of the defendant's management of his brother).

The court considers Zavala's relationship with a number of these couriers, below.

*a. Mario Morales:* Mario Morales, in the government's stipulated facts, testified that Zavala hired him to collect money from English-speaking customers when Zavala left the country for Costa Rica on July 28, 1982. SFG at 17–22. Morales also testified that he collected drug money from Tom Benson a few days before the defendant left for Costa Rica in July. SFG at 18.

Zavala testified in his stipulated facts that he never knew Linsig was using Morales to help collect money from Zavala's customers. SFZ 23–24. The defendant also says he never sent Morales to collect money from Tom Benson. *Id.* at 24.[9]

The court, however, finds that the defendant did hire Morales to help collect debts from English-speaking customers. To find otherwise does not make any sense. The defendant admits that he left Linsig to collect money from his customers when he was in Costa Rica in July of 1982. 1 R.T. at 83. According to Linsig's testimony, some of these debts were from English-speaking customers, like Tom Benson. 4 R.T. at 314–15, 317. Linsig does not speak English. 4 R.T. at 316. The court does not understand how Linsig was supposed to collect debts from the defendant's English-speaking customers unless he had assistance. Mario Morales does speak English. SFG at 18, line 12. The court finds that the version of events testified to by Linsig and Morales, is more credible than the defendant's denial that he never used Morales to help collect drug monies owed to him.

The court, thus, also concludes that the defendant supervised, organized, or managed Morales for purposes of the CCE.

*b. Carlos Cabezas:* Carlos Cabezas testified to his work for Zavala in detail. He first started working for the defendant in late October or early November of 1981. Zavala gave him $1500 to rent an office in San Francisco, from which Cabezas could deliver cocaine to Zavala's customers. Zavala was, at that time, apparently very

---

9. The government also points out that the defendant did not deny in court that he supervised Morales, though he did run through a list of individuals and deny supervising them. 1 R.T. at 61–62. The court finds it difficult to say what weight it should put on this; perhaps it was just an oversight. The court explicitly considers the defendant's denial that he supervised, managed, or organized Morales, in the SFZ at 22–23, but finds, as discussed in the text, that other evidence in the case proves otherwise.

concerned that too many of his customers were coming to his house to pick up cocaine, and that Zavala might be caught. 2 R.T. at 184, 187–88. Cabezas also says he picked up drugs from Alvaro Carvajol-Minota and delivered these drugs to Zavala's customers when Zavala was in Costa Rica in late December of 1981 to January of 1982. SFG at 29. The defendant admitted that Cabezas was collecting money from the defendant's customers in December of 1981. 1 R.T. at 79. Cabezas also testified that, from March 1982 through June 1982, he picked up and delivered cocaine to Zavala's customers and collected payments. SFG at 30. He received $500 for each kilogram which he delivered and for which he collected payments. SFG at 29.

Carlos Cabezas also testified that he sold a half a kilogram of cocaine on his own during the time that Zavala was in Costa Rica in late 1981 to January 1982. SFG at 30. And, beginning in January of 1982, Carlos made arrangements to buy cocaine from Horacio Pereira. SFG at 30. He told the defendant about this supply because he wanted to sell the cocaine to the defendant's customers. *Id.* Cabezas says the two agreed to split the profit from this cocaine, and Cabezas sold approximately eight kilograms of Pereira's cocaine. *Id.* Cabezas kept records of the sales of Pereira's cocaine, Government Exhibit HB–1. This record reflects at least one transaction in which Cabezas did split the profit with the defendant. 3 R.T. at 246–47.

Cabezas also testified that he went into business on his own in the summer of 1982, 3 R.T. at 239, with Alvaro Carvajal-Minota as his supplier. He did so because Zavala had too many financial troubles with Alvaro and Alvaro had stopped supplying cocaine to the defendant. SFG at 31.

The defendant testified that he and Cabezas sold Alvaro's cocaine as partners, SFZ at 10, and that he never supervised, organized, or managed Cabezas. 1 R.T. 62. Zavala even claims that, at one time in October or November of 1981, he sold cocaine for Cabezas. SFZ at 9. The defendant also implies that Cabezas introduced him to Charlene Rizzo, Douglas Coleman, and Thomas Benson, around October of 1981.[10] But the defendant also testified that Benson and Charlene Rizzo were *his* drug customers in the early part of 1981. 1 R.T. at 67.

In fact, the evidence shows that Alvaro held Zavala responsible for paying for the drugs that Alvaro sold to Zavala. SFZ at 11, 1 R.T. at 82. Zavala claims this was so, even though he introduced Cabezas to Alvaro as the defendant's "partner." SFZ at 10. The court doubts, however, that a drug supplier only would hold one person responsible for a debt, if the supplier understood that two persons were partners in the everyday sense of that word. Alvaro Carvjal-Minota's perception is some evidence to the court that Cabezas did work at Zavala's direction when delivering the cocaine obtained from Alvaro.

Moreover, the court views Cabezas' record keeping, Exhibit HE–1, as evidence of the nature of his relationship to the defendant, and as acts of a subordinate. Zavala does not contest the authenticity of exhibit HE–1 or that this record book reflects recordkeeping in Cabezas' hand, of

---

**10.** The defendant's testimony in his stipulated set of facts reads:

> In the latter part of October, 1981, in response to an invitation from Carlos Cabezas to come to his house, I visited him and he again begged me to help him get back into the drug business. I told him that I was not doing anything, and I was planning on going back to Nicaragua, since Lacayo was there and I was supposed to meet him there. Carlos told me that he knew somebody with a supply of cocaine but he did not know any people to sell it to. Since I was looking for some funds, I went along with him. During this conversa-

> tion, a friend of his, Rafael Solano, was present. Carlos and I got together and visited his friend who, at that time, was living in San Francisco with Carlos' sister-in-law, Nora Poessy. We decided that we were going to work together and that is how I was introduced to Charlene Rizzo, Douglas Coleman, and Tom Benson. At about that same time, we met a lady who we later found out worked for Horacio Pereira. Carlos and his family went with her to Tijuana, Mexico, where they picked up 2½ kilos of cocaine and brought them back, and I sold it for them.
> SFZ at 9.

drug transactions. Zavala says that Cabezas kept HE–1 for Cabezas' business purpose and not to record the defendant's business. The court concludes otherwise.

First, Cabezas testified that he kept the records for the defendant. 1 R.T. at 111; SFZ at 30. Second, it is uncontroverted that HE–1 was found in defendant's house in a February 15, 1983 search, well after the time when everyone agrees Cabezas was dealing cocaine on his own. SFG at 4. The court can think of no reason why this book would be at the defendant's house, instead of at Cabezas' house, if the book was truly Cabezas'. The court also takes note of the entries, in HE–1 that further prove that the record was for Zavala's information. As just one example, the court refers to Cabezas' testimony about his entry, in HE–1, of a $480 loan to himself. 1 R.T. at 126. The court agrees with the government's suggestion that this entry is evidence that Cabezas was keeping the record for someone else.

Cabezas also testified that he kept other drug ledgers for Zavala, specifically ledgers for the business in late 1981 and January of 1982. Cabezas and Zavala destroyed these records, however, in early 1982. 1 R.T. 112–13, SFG at 31.

The court finds that the defendant and Cabezas were partners on some drug deals (sale of cocaine supplied by Pereira), and that Cabezas may have been dealing cocaine on his own. But, the evidence also shows that Cabezas did deliver drugs to and collect money from the defendant's customers during at least two time periods: November, 1981, to January, 1982, and from March through June of 1982.

As a collector and a drug runner for the defendant, the court finds that Cabezas was supervised, organized, or managed by the defendant. The court also finds that, insofar as Cabezas acted as a bookkeeper for Zavala, he was also in a relationship with the defendant that falls within the scope of the CCE. *See, e.g., United States v. Adamo,* 742 F.2d 927, 933 (6th Cir.1984) (defendant's bookkeeper a subordinate for the purpose of 21 U.S.C. § 848).

*c. Nestor Arana:* The government presents evidence that Nestor Arana was delivering drugs or money and/or collecting drug money for the defendant during two time periods: the latter part of 1981 and October through December of 1982.

To prove Arana's work for Zavala in late 1981, the government presents Cabezas' testimony that he saw Arana and Zavala with money in a suitcase in approximately the fall of 1981. Zavala told Cabezas then that Arana was taking the money to Danilo Lacayo in Miami. SFG at 29. Zavala admits to buying cocaine from Lacayo throughout 1981. 1 R.T. at 65–66. The government also presents the testimony of Ernesto Linsig-Cabellero that Zavala told him in approximately September of 1982 (shortly before they moved to South San Francisco), that Nestor had worked for the defendant in 1981 helping the defendant sell the cocaine from Lacayo. SFG at 8.

To show Arana's employment with the defendant in late 1982, the government relies heavily on Linsig's observation. The defendant and Linsig were living together from July 1982, SFG at 6, and he moved to South San Francisco with the defendant in September of 1982, SFG at 8. Arana moved in with them by November of 1982. SFG at 8; 1 R.T. at 87. After Arana moved in, Linsig observed Arana deliver drugs to Zavala's customers and collect money. SFG at 9. Moreover, Linsig says he and Arana went to Los Angeles to pick up cocaine from Claudio. SFG at 9. Finally, Linsig testified that the defendant told him that Arana was to be in charge of everything when the defendant left for Costa Rica at the end of 1982. SFG at 9. On December 10, 1982, Linsig left for Nicaragua, and did not return until February 8, 1982. SFG at 10. Zavala went to Costa Rica in late December of 1982.

The government also offers the testimony of Lydia Guiterrez, the defendant's housekeeper, that she knew Zavala had left Arana in charge of his business when he left in December of 1982. She also testified that she kept money that Arana col-

lected and that she knew he was collecting the money for Zavala. SFG at 25.[11]

Zavala denies that he supervised, organized, or managed Arana. The court finds, however, despite the defendant's denial, that Arana did perform pick-up and delivery—i.e., courier—work for Zavala. Again, on these facts, the court finds that the defendant supervised, organized, or managed Arana for purposes of 21 U.S.C. § 848.

### d. Edmundo Roche:

Roche, was arrested with Zavala in May of 1981. He was riding in the defendant's car, when the police stopped the car and discovered cocaine. SFG at 43, 1 R.T. at 89 (testimony of the defendant). Both were charged in a state court proceeding with possession of cocaine. Roche eventually pleaded guilty to the state charge. SFG at 45; 1 R.T. at 89. The defendant did not plead guilty in this state action, 1 R.T. at 89, but it is not clear what happened to him as a result of the state action.

The defendant paid for both his and Roche's attorney's fees. 1 R.T. at 89. The court does not find that Roche's lawyer, hired by Zavala, told Roche that he should plead guilty in return for money.[12] And, thus, the court will not speculate as to why

Roche pleaded guilty. From November 1981 to August 1982, while Roche was in prison, Zavala did send money to him or his family (under $5000) through Cabezas. SFG at 45–46; 1 R.T. at 90. Carlos Cabezas' testimony indicates that Roche requested the money, while he was in prison, by calling Cabezas and asking him to call the defendant for money. 3 R.T. at 253–54.

The government has shown also that Roche accompanied Doris Saloman on a delivery of cocaine for the defendant in early June of 1981. SFG at 43–45. Both were arrested and charged in federal court. SFG at 45. Doris Saloman paid Roche's attorney's fees in this case. 1 R.T. at 17.

Given these facts, the court does not find that Zavala supervised, organized, or managed Roche in the manner required by the CCE. The May 1981 arrest establishes only that Roche was with the defendant in a car and happened to be arrested. The court recognizes that one typical indicia of management is that a manager pays attorney's fees for his underlings. *See, e.g. United States v. Losada,* 674 F.2d 167, 173 (2nd Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982) ("For example, her [the defendant's] payment of

---

**11.** As evidence of Arana's courier activities, the government introduced a tape of a September 12, 1982 phone conversation between Zavala and Mario Leon. The defendant calls Leon in the hospital and asks Leon whether he knows a customer named Jerry, and whether Jerry is "cool." Leon says Jerry is okay, and the defendant says he is going to send "Nestor," to take drugs to Jerry.

The defendant only disputes the government's presentation of this conversation to the extent that he says he said "Ernsto" instead of "Nestor." The defendant has already conceded that he managed Ernesto Linsig-Cabellero. The court, however, after carefully listening to the tape determines that the defendant said "Nestor."

The court does not rely on this evidence to show that Zavala managed Arana. First, the court notes that in the conversation charged in count five, Zavala asks for Ernesto by calling him "Nestor." And the person who initially answers the phone, calls out "Nestor," to get Ernesto to come to the phone. It could be that, on September 12, 1982, Zavala said "Nestor" and meant Ernesto.

Moreover, the court considers Linsig's testimony that he went with Zavala to a Lyon's Restaurant to deliver drugs to a Jerry in a silver BMW, during a time when Mario Leon was in the hospital. 4 R.T. at 348–49. The court heard a surveillance agent, who worked on Zavala's case, testify that he observed a Silver BMW in the parking lot of Lyon's restaurant on September 12, 1982. He was unable to testify who was in the car, though. The court finds that, the agent's testimony, combined with Linsig's recollection, indicates to the court that it was Ernesto who went with Zavala to deliver drugs to Jerry on September 12, 1982, after Zavala confirmed in the call to Leon that Jerry was "okay."

Even though the court disregards this September 12, 1982, phone call, the court finds sufficient evidence to establish that Zavala supervised, organized, or managed Arana.

**12.** The court just has the unequivocal but conflicting testimony of Roche's lawyer, 1 R.T. at 14, and Roche. In light of the government's burden of proof, the court cannot make the finding about what the lawyer might have said to Roche to induce Roche to plead guilty.

bail and attorney's fees for an arrested drug seller strongly indicated that there was a group involved in this ongoing criminal activity"). Here, the defendant did pay Roche's attorney's fees in the May, 1981 case. The court views this payment, like money Zavala gave Roche while he was in prison, not as money in return for services. Rather, these payments were in the nature of gifts, similar to the other acts the defendant took to help old friends or friends of the family. The record is full of examples when the defendant would help people who came to him. SFG 28–29 (Cabezas); SFG at 6 (Linsig-Cabellero); SFG at 17–18 (Morales). Zavala would give people money, a place to stay, and unfortunately for him, jobs in his drug business.

In Roche's case, the court only has the evidence of one job by Roche for Zavala in June of 1981. The court, however, does not find that this showing is sufficient for 21 U.S.C. § 848. Proof of one instance where another did a task for the defendant should not support a finding that the defendant supervised, organized, or managed that person. Such a finding would not comport with this court's understanding of the ordinary meaning of the words in § 848. *Contra, United States v. Dickey*, 736 F.2d 571, 587 (10th Cir.1984) (court found sufficient evidence of control because the evidence showed that the defendant "organized or directed" Doc Clanton, Bob Best, Rod and Ruth Bragg, Scott Dickey, Jo Hall, and Joe Hill each on at least one occasion; the discussion of the evidence in *Dickey* shows that the defendant directed the activity of some of these people on many occasions).

The court has found that the defendant has supervised other persons on a number of occassions and over a period of time. The court will continue to require such a showing.

### e. Doris Saloman:

The court does not have much evidence regarding Doris Saloman's participation in the defendant's drug business. Doris Saloman is now the defendant's wife. At the time relevant to her alleged participation in the defendant's conspiracy, they were romantically involved. 1 R.T. at 72–74. The court also has the fact of her arrest in June of 1981 with Roche, while they were on their way to deliver drugs for Zavala.

Again, the court will require more than proof of one incident where Saloman acted at Zavala's direction before saying that he supervised her. Therefore, the court does not find that Zavala supervised, organized, or managed her.

### 2. "Helpers":

The government alleges that two persons aided in the message taking and storing tasks, at the direction of Zavala.

### a. Lydia Guiterrez:

She was Zavala's housekeeper from late December, 1981 to January, 1983. SFG at 17. During that time she not only acted as the defendant's housekeeper, she also acted as an aide or secretary to Zavala. For example, Cabezas testified that he left messages with Guiterrez regarding the drug business. 1 R.T. at 139, 1 R.T. at 102. The government and defendant presented two slightly different translations of a September 23, 1982, conversation between Cabezas and Guiterrez to demonstrate her relationship to Zavala. The contents of both translations show that Cabezas calls Zavala's house and does leave a message with Guiterrez for Zavala regarding his collection efforts. Cabezas also testified that he heard Zavala tell Lydia to keep any items people brought to the house, if someone came by in Zavala's absence. 1 R.T. at 140.

█ Guiterrez also testified, in the Government's stipulated facts, that she held drug monies, given to her by Linsig-Cabellero (from August 1982 on), and Nestor Arana (from late December 1982 through early 1983), SFG at 25. He testified that she knew that they were in charge of the defendant's drug business in his absence. SFG at 25. She maintained various ledgers, Exhibits HE–10, HE–11, and HE–12, to keep track of money that Arana collected. SFG at 25. Zavala may not have explicitly told her to keep money for Arana and Linsig, but she knew that

they were collecting his money. Thus, when she held the defendant's drug money at their request, she was acting for her employer.

The court concludes that Guiterrez was not only Zavala's housekeeper, she also served as an aide or in a secretarial capacity, by taking messages and holding monies. And in the ordinary use of the word, she was "supervised" by Zavala.

*b. Angela Cabezas:* It is really undisputed that during the time Carlos Cabezas worked for Zavala (late 1981 to July or August 1982), Angela took messages for Carlos about his drug collection efforts and on a few occasions would call Zavala with messages about Zavala's drug business. 3 R.T. at 256–59.[13]

■■■ The government admits that Zavala did not recruit her directly, but says that fact is irrelevant, citing *United States v. Bolts,* 558 F.2d 316 (5th Cir.), *cert. denied* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). The court in *Bolts* did say that it is immaterial if an organizer has no personal contact with those who act as couriers for his drugs, and who are underlings in the distribution operation. *Id.* at 320. The court is not convinced, however, that the fact that Angela helped out her husband, by occasionally relaying messages to Zavala is sufficient to support a finding that Zavala supervised, organized, or managed her. The court finds that her activity was just too peripheral to support the conclusion that Zavala exercised any authority over her.

*3. Drug customers:*

The defendant stipulated that he typically "fronted drugs" for a number of people. SFG at 3. Zavala's customers in turn would sell to their customers and then pay Zavala from the proceeds of their sales. He fronted drugs to many more than those four persons whom the government needs to show Zavala organized to establish a CCE. The defendant denied, and the government does not show, that he told his customers where, when, or how to sell the cocaine once they got it. 1 R.T. at 63–64.

While the facts of the defendant's fronting of drugs are clearly established, the difficult question is whether a defendant, under the CCE, supervises, manages, or organizes those persons to whom he sells drugs by the practice of fronting. The government likens the situation to a consignment, or a drug franchise; an arrangement that, given the economic realities of the trade, was the only reason why these customers could buy and deal drugs. The defendant, of course, argues that finding that Zavala organized or supervised his customers is beyond the meaning of those words as used in the CCE statute.

The court has only found one case in which the defendant fronted drugs and the court had any comment on whether this was sufficient to establish the defendant as a superviser, organizer, or manager. In *United States v. Dickey,* 736 F.2d 571, 588 (10th Cir.1984), the court held that the evidence was sufficient to show the defendant Hall's control relationship with at least five persons. The court pointed to the evidence that "Hall directed the Braggs about the manner of payment for the drugs he was fronting to them and Dickey." *Id.* Further evidence was that the defendant directed his customers not to obtain the fronted drugs at his home but to go to another designated spot. *Id.*

In this case, it would seem obvious that, in making sales, Zavala or his employees, surely told the customers "come here" or "go there" to pick up drugs, or "bring me money here." Evidence also suggests that in October or November of 1981, when Zavala gave Carlos Cabezas money to rent

---

**13.** The government relies on the conversation in count six to support its argument that Zavala managed Angela Cabezas during the time that Zavala was managing Carlos. The conversation in count six, however, took place on September 13, 1982. The court understands that the government's theory is that Carlos Cabezas was working on his own after July or August of 1982. Thus, the September 13, 1982, conversation does not really tell the court anything about Zavala's management of Angela because the court understands that the government does not contend that Zavala managed Angela after Carlos was working on his own.

an office to take the "heat" off the defendant, he probably told his customers not to come to his house, but to see Cabezas for drugs at this office.

Normally, the defendant convicted of a CCE is doing much more than telling his customers where to pick up fronted drugs and that they must pay for the drugs. In one case, the defendant "alone set the terms for Cordano's sale, including the quantity and place of delivery and that Cordano had no latitude to vary Mannino's [the defendant's] instructions. *United States v. Mannino,* 635 F.2d 110, 117 (2d Cir.1980). Finding that Zavala supervised his customers on the facts of this case would be like saying a creditor supervises or manages his debtors, merely because of the existence of the debt. It is doubtful that the ordinary meaning of "supervise," "organize," or "manage" covers such a situation.

The court, however, does not resolve this question of law. It is satisfied that, in addition to Ernesto Linsig-Cabellero, Zavala supervised, organized, or managed Mario Morales, Nestor Arana, Carlos Cabezes, and Lydia Guiterrez.

 (5) Finally, the government must show that the defendant gained substantial income from the alleged enterprise. Courts use this element to exclude from the scope of the CCE statute those "trivial amounts derived from occasional drug sales." *United States v. Losada, supra,* 674 F.2d at 173. In *Losada,* the court said that even if the court assumed that the defendant only gained $2000 in income from her cocaine sale, "that is not so insignificant as to render the statute inapplicable." *Id.*

To prove the income element of the CCE the government need not even prove a definite amount of *net* profit. It is sufficient to show substantial gross receipts, gross income, or gross expenditures for resources. *United States v. Dickey,* 736 F.2d 571, 588 (10th Cir.1984); *United States v. Jeffers,* 532 F.2d 1101, 1117 (7th Cir.1976), *aff'd,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977).

In this case, the defendant stipulated that he sold cocaine for an average of about $63,400/kilogram and that he bought it for prices ranging from $45,000 and $60,000. SFG at 4. He also stipulated that he was involved in the distribution of approximately 30 kilograms. *Id.* The court finds that the amount of money generated from the sale of 30 kilograms, in which Zavala shared, is substantial enough to bring his activities within the CCE statute.

CONCLUSION:

For the foregoing reasons, the court finds the defendant GUILTY on counts three, four, five, six, eight, and twenty-five. The court finds the defendant NOT GUILTY on count seven. The court dismisses count one of the indictment and vacates the defendant's guilty plea to that count.

Judgment shall be entered accordingly.

IT IS SO ORDERED.